UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
                                    :

JOHN BAYDALE, *on behalf of himself and all* :   Electronically Filed
*others similarly situated,*                 :

                 Plaintiff,     :

   - against-                 :   09 Civ. 3016 (WHP)

                                      :

AMERICAN EXPRESS COMPANY et al.,  :

                 Defendants.  :

------------------------------------------------------- :
                                    :
                                    X

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

                                                                                   Page

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................4

PARTIES .............................................................................................................4

PLAINTIFF'S CLASS ACTION ALLEGATIONS............................................5

ALLEGATIONS...................................................................................................7

    A.    The Spend-Centric Business Model...............................................7
    B.    AMEX's Charge Card and Credit Card Businesses ......................8
    C.    The Subprime and Credit Crisis...................................................20
    D.    AMEX's Lagging Write-Offs and Understated Loss Reserves...........................25
    E.    Defendants Admitted They Had the Real Time Data to Accurately Disclose Growing Credit Losses..................................29
    F.    American Express's Enormous Funding Requirements and Need to Sustain Its Credit Ratings.................................................31
    G.    The Confidential Witnesses .........................................................35

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................52

THE TRUTH BEGINS TO BE REVEALED ...................................................70

APPLICATION OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE ......................................................................................82

NO SAFE HARBOR .........................................................................................83

FIRST CLAIM: Violation of Section 10(b) of The Exchange Act and Rule 10b-5, Promulgated There Under Against All Defendants......................................83

SECOND CLAIM: Violation of Section 20(a) of The Exchange Act Against the Individual Defendants .......................................................................................87

PRAYER FOR RELIEF ....................................................................................88

JURY TRIAL DEMANDED.............................................................................89

## INTRODUCTION

1.       This is a class action brought for violations of the anti-fraud provisions of the federal securities laws, for false and misleading statements and omissions made in connection with the sale of securities of the American Express Company ("AMEX" or the "Company") from January 22, 2007 through November 12, 2008 (the "Class Period").

2.       As described in AMEX's SEC filings and annual reports, and as continuously touted by Kenneth Chenault ("Chenault"), AMEX's Chief Executive Officer ("CEO"), in earnings conferences and meetings with the financial community, AMEX purported to follow what it termed a "spend-centric" business model.  This model emphasized generating revenues primarily by driving spending on the Company's charge and revolving credit cards and only relied secondarily on interest income and finance charges imposed on credit card holders for its profitability.  High spending on AMEX cards created transaction fees or, as reported on AMEX's financial statements, "discount revenue," which was the Company's largest revenue source, representing fees charged to merchants when cardmembers used their cards to purchase goods and services on the Company's card network.  This fee ranged from 2-3% of the customer's purchases.

3.       The flip side of this model, which Chenault repeatedly (and falsely) denied, was that, beginning in or about 2005 through 2007, AMEX made increasingly risky extensions of credit to existing and new cardholders to drive the growth in its discount revenue.  As one of the confidential witnesses explained, AMEX preferred granting new cards and higher credit lines to those "spending a lot of money," than to those with lower debt to available credit ratios.  And while a business model geared to increasing discount revenues might, in some circumstances, be a legitimate business strategy, throughout the class period, Defendants misled investors about the

sharp increases in the risk AMEX was assuming, and failed to recognize ballooning credit losses from cardmembers' increasing non-payments or "delinquencies" in payment, as expense through increases in AMEX's loss reserves.

4.     From January 2005 through 2007 AMEX's United States ("U.S.") "owned" credit cardholder loan balances grew from $24.8 billion to an astounding *$43.3 billion* dollars, or more than 25% per year.  Even in 2007 when adverse shifts in the U.S. economy had become apparent and AMEX's peers began to tighten credit standards, AMEX barreled on, increasing its U.S. cardholder loan balances by 29%, or $9.8 billion.  When analysts following AMEX's stock questioned Chenault about the risks the Company was assuming, Chenault falsely assured them that AMEX had not lowered its underwriting standards and that AMEX's superior and patented "share of the wallet" technology which permitted in-depth analyses of each aspect of its cardmembers' wealth, including key home values and associated mortgages, income and day-to-day expenditures, supported the Company's credit-making decisions.  Defendants, to further support their claims that AMEX's extraordinary growth did not portend enormous future cardholder losses, repeatedly directed investors to stale "write-off" rates -- which lagged Defendants' "real time" payment delinquency data by at least six months to more than a year -- and FICO scores which had not been updated to reflect these current cardholder defaults in payment and changed credit status.

5.     In addition, AMEX "securitized" major portions of its cardholders' debt.  For cardholder accounts transferred into trusts for AMEX's securitizations, investors and analysts had access to detailed credit information, such as payments 30 days overdue, 30-60 days overdue, and more than 90 days overdue, and the rate at which delinquencies "rolled" from one bucket to the next more severely overdue bucket, defaults by acquisition year of cardholder loans

(*i.e.*, by "vintage year") and, with respect to other aspects of the current credit performance and trends in these cardholder accounts -- to which Defendants often pointed AMEX's own investors as a proxy for the credit performance of cardmember receivables and loans remaining on AMEX's own books. By so doing, Defendants misled investors about AMEX's true risks and current losses, because, as Defendants would later reveal, less risky cardmember accounts had been included in the securitizations than retained by AMEX for its own (or "owned") books.

6.    Thus, when AMEX unexpectedly announced a huge $440 million bump up in its fourth quarter 2007 ("4Q07") reserves for credit losses, and a second $600 million surprise for second quarter 2008 ("2Q08"), for increases in its loss reserves, AMEX's stock price plummeted. Although through third quarter 2007 ("3Q07"), AMEX reported the lowest levels of cardholder delinquent account "write-offs" in its industry, by the end of the class period, AMEX was among the highest. The reason for this discrepancy is that AMEX's "write-offs" measured problems in customer accounts that first appeared more than six months to twelve months earlier -- since under AMEX's accounting policies delinquent charge card holder receivables were first "written off" 360 days after the cardholder became delinquent, and delinquent credit card holder lending receivables were first "written off" 180 days after their payments became delinquent. Thus, "write-offs" lagged AMEX's cardholders' defaults in payment, and Defendants failed to reserve for AMEX's known and growing losses.

7.    Defendants engaged in these fraudulent practices, in large part, in order to support the Company's stock price and the credit ratings it needed to access the financial markets to underwrite AMEX's huge cardmember receivables. Credit ratings turned, in large part, on the perceived value of AMEX's multi-billion cardholder balances, and drove the financial costs at which AMEX could borrow and securitize its accounts. By November 2008, AMEX's inability

to sufficiently access the credit markets was so critical that it threatened its very existence, and AMEX's survival was only assured by action by the Government to permit the Company's conversion to a bank-holding entity and a $3.5 billion bailout by U.S. taxpayers.

## JURISDICTION AND VENUE

8.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

9.    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  AMEX's principal executive offices are at 200 Vesey Street, New York, New York.

## PARTIES

10.    Plaintiff Local No. 38 International Brotherhood of Electrical Workers Pension Fund purchased American Express common stock at prices that were inflated by the fraud described in this Complaint, as described in its certification filed in this action, and was damaged as the fraud was revealed and American Express's stock price declined.

11.    Defendant AMEX is a leading global payments and travel company.  Its principal products and services are charge and credit card products and travel-related services offered to consumers and businesses around the world.

12.    Defendant Chenault is, and at all relevant times was, AMEX's Chairman and CEO.  Throughout the Class Period, Chenault knowingly and/or recklessly made false and misleading statements in Chenault's earnings conference calls, in meetings with the financial community for his efforts to raise funds for the Company and in meetings with analysts. Chenault also permitted other Defendants to make false and misleading statements without correction.  Chenault also knowingly and/or recklessly signed and/or approved false and/or

4

misleading written reports and statements of the Company's financial performance and condition. Chenault was a member of the senior operating group that regularly received reports about the Company's cardholders, including with respect to their spending and credit performance.

13.     Defendant Daniel Henry ("Henry") is, and for most of the class period was, AMEX's Executive Vice President and Chief Financial Officer ("CFO"). Henry has been Executive Vice President and CFO since October 2007, and served as the Company's acting CFO prior to that date. Beginning in or about April 2007 Henry began attending earnings conference calls and Financial Community meetings on behalf of AMEX, and made false and misleading statements in the calls and in meetings with the financial community and in meetings with analysts, and permitted other Defendants, including Chenault, to make false and misleading statements without correction. As described by knowledgeable confidential witnesses, the Company's risk management, financial analysis and United States Card Services ("U.S. Card Services") units reported business results to him, at least on a dotted line basis, and he received regular reports on the true and current credit performance, and metrics of AMEX's cardholders from these groups.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of American Express during the Class Period, and who were damaged thereby (the "Class" or "Plaintiffs"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AMEX common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AMEX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of American Express;

(c)    whether the price of American Express common stock was artificially inflated during the Class Period; and

        (d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**ALLEGATIONS**

**A.     The Spend-Centric Business Model**

20.    The amount charged on American Express's cards was known as "billed business" or "spend."  In 2007, American Express's billed business, or "spend," was $459.3 billion, up approximately 13 percent, or $52.5 billion, from 2006 and up approximately 30 percent, or $104.7 billion, from 2005.  American Express had 52.3 million cards in force in the United States, up approximately 9 percent from 2006 and approximately 22 percent from 2005.  As a result of this increased spending, discount revenue for 2007 rose $1.6 billion to $14.6 billion, approximately 12 percent higher than in 2006.  Until fourth quarter 2007 ("4Q07"), AMEX also reported growing profitability from its strategy to force higher transaction fees by building up cardholder loans.

21.    A key aspect of the business strategy that was repeatedly touted by Chenault and the other Defendants to explain AMEX's success in comparison to its peers, what Defendants referred to as AMEX's "spend-centric" versus its peers' "lend-centric" model, was the acquisition of high-spending cardmembers who would drive up spending on AMEX's card network.  In addition, a portfolio of high-spending card holders helped the Company to justify its

7

premium discount rate to merchants.  According to the Defendants, high average spending on
AMEX cards represented greater value to merchants who accepted the cards in the form of loyal
customers and higher sales.

22.     To attract high-spending card holders and justify its premium discount rate to
merchants, Defendants made frequent, robust assertions of AMEX's status as a business that
catered to affluent clients.  For example, in a March 3, 2008 Letter to Shareholders, Chenault
proclaimed that "American Express is known for establishing relationships with prime and
affluent customers" and described American Express as "a brand-driven *marketing services
company* that helps merchants reach the best customers and prospects. . . ."  In its 2007 Annual
report, AMEX stated that a core element of its strategy was "focusing on acquiring and retaining
high-spending, creditworthy Cardmembers across multiple groups."

23.     Reflecting its focus on promoting premium associations in connection with its
brand, AMEX stated in its 2007 annual Form 10-K that "Our brand has been rated one of the
most valuable brands in the world in published studies, and we believe it provides us with a
significant competitive advantage.  We believe our brand and its attributes are critical to our
success, and we invest heavily in managing, marketing and promoting it."  Similarly, Business
Week Magazine ranked the AMEX brand as the 14th and 15th most valuable in the world in
2006 and 2007, respectively.  According to the article, the value of AMEX's brand was
approximately $21 billion in 2007.

**B.      AMEX's Charge Card and Credit Card Businesses**

24.     AMEX is now and throughout the Class Period has been a leading global
payments and cardholder lending company.  During the class period, its principal products and
services were charge and credit payment card products and travel-related services offered to

consumers and businesses around the world.  AMEX offered charge cards such as the American

Express Card, the American Express Gold Card, the Platinum Card and revolving credit cards

such as "Blue" from American Express, "Blue Cash Card" and "Blue Sky."  AMEX also offered

a variety of Cards sponsored by and co-branded with other corporations and institutions, such as

the Delta SkyMiles Credit Card from American Express, True Earnings Card exclusively for

Costco Members, Starwood Preferred Guest Credit Card and JetBlue Card from American

Express.

      1.    <u>AMEX's Traditional Charge Card Business</u>

      25.    AMEX's charge cards allowed holders to charge purchases from merchants who

accepted their cards.  AMEX charges a transaction fee of between 2-3% of the cardholder's

purchase to the merchant, and within a few days of the cardholder's purchase, remits payment to

the merchant permitting the merchant to receive cash quickly for cardholder purchases and

relieving it of the credit risk for the purchase.  Historically, until about 1999, when the "Blue"

revolving cards were launched, American Express dealt almost exclusively with non-lending or

"charge" cards -- it catered to affluent cardholders who charged travel and similar services, so

that they did not need to carry large amounts of cash for these purchases.  The value of these

convenience-oriented services to cardholders became progressively less relevant as on-line

providers of travel services competed for this business, and, to stay competitive, AMEX

refocused its efforts to "reward" cardholders with "miles" and other incentives for using its

cards.  Beginning in or about 2005, AMEX also began to ramp up its lending business -- as one

confidential witness ("CW") put it, AMEX's Blue card "lending" business became "turbo-

charged."

26.     As described above, traditional charge cards were primarily designed as a method of payment rather than as a means for cardholders to finance purchases of goods or services, so that they carried no pre-set spending limits.  Charge card holders generally had been required to pay the full amount billed each month, and no interest or other finance charges were assessed to cardmembers from the time of their purchases until their monthly bills were paid.  On its books and financial reports, American Express reported the amounts due from these cardmembers as "receivables."

27.     Thus, American Express's historical charge card business generated revenue in two principal ways.  First, as described above, the charge cards generated transaction fees or "discount revenue" payments from merchants each time a card holder used the cards to make a payment.  In addition, the card holders paid American Express an annual fee for the privilege of having the card.

2.     AMEX's "Lending on Charge Card" Business

28.     Early on, when a charge cardholder occasionally had difficulty paying off a large balance, AMEX had a "sign and travel" option by which the cardholder could extend its payments at a modest interest rate.  Beginning in or about 2005, and by the time of the class period, however, this extended payment program, which was described in AMEX's April 19, 2007 first quarter earnings call as "lending on charge," had ballooned to 20-25% of AMEX's multi-billion dollar cardholder "lending" receivables balance.  The program had evolved to permit charge card holders who had difficulty paying their balances in full to segment their charges for all but nominal purchases -- *i.e.*, purchases for amounts less than $200 -- and to pay the remainder on extended terms.  This iteration of the program imposed fees for use of this option as well as hefty interest charges.  As a general matter, charge holders who exercised this

option could be considered current, by making minimum payments of 2% of the principal, plus accrued interest, like AMEX's credit card holders.

29.    Where charge card holders signed up for this option, however, they were charged rates of interest that significantly exceeded the interest rates charged on AMEX's revolving credit cards -- so that, as various CW's explained, the widespread use of this program was an indication that AMEX's charge holders were experiencing financial difficulties.  Indeed, even Chenault explained during a November 13, 2007 Merrill Lynch Banking and Financial Services Investor Conference, that "Green," "Gold" and "Platinum" charge chard holders were opting to use AMEX's "Lending on Charge" products, "as needed" to pay over time.

30.    As CW2 explained, charge cardholders who used the "lending on charge" option did not have credit limits, and cardholder "delinquencies" could be avoided if charges were transferred to this program before charge cardholder accounts became 90 days past due.

31.    As CW2 and CW7 described, AMEX customer service employees were paid bonuses to sign up charge holders for this option, because of the high rates of interest levied on cardholders' balances.

32.    The "lending on charge" program blurred the line between traditional charge cards and credit cards which had specific borrowing limits and contracted for interest rates. Amounts that charge card holders segmented for this program were included as cardholder "loans" or "lending" receivables on the Company's financial statements and in presentations to investors.

3.    AMEX's Burgeoning Lending Card Business

33.    Beginning in or about 2004, AMEX began to rapidly grow its "credit" or "lending" card business.  CW4 explained that AMEX had developed and offered more than 100

11

different extended payment credit cards, many of which were "co-branded" with merchants in its rewards programs.

34.    As described in AMEX's 2007 Annual Report, in 2007, cardmember loans rose 22 percent on a "managed basis" and 26 percent on a "GAAP" or owned basis, well above the growth rates of AMEX's peers in the credit card business.[1]  Much of this growth was in the "U.S. Card Services" business -- *i.e.*, to United States cardholders.

35.    In charts published after the class period, AMEX reported the following levels of U.S. Cardmember "Lending Owned" balances and growth over the prior year, in billions of dollars:

| 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|
| $19.6B | $24.8B | $33.5B | $43.3B |
| 11% | 26% | 35% | 29% |

These balances included the extended payment purchases segmented in AMEX's "lending on charge" cardholders' accounts.  According to Chenault, 90% of the growth in the Company's loan balances was attributable to cardholder lending to existing cardholder customers. According to one CW, in or about 2006 AMEX automatically and electronically increased cardholders' lending limits.

36.    Thus, in 2005 and 2006 as the economy over-heated, and even in 2007, when the credit crisis which had begun in the subprime mortgage sector was well under way, and other card issuers began to cut back on the credit extended to its members, American Express

---

[1] Throughout the class period, AMEX presented its results from its lending business on both an "owned" and on a "managed" basis.  The managed basis presentation assumed that there had been no off-balance sheet securitizations, *i.e.* all securitized cardmember loans and related income effects were reflected as if they were in the Company's balance sheets and income statements, respectively.  Thus, during the class period, the managed data presented delinquency data that combined the delinquencies from off-balance sheet securitized loans with the delinquency rates for loans for which American Express retained the credit risk.

continued to aggressively add new charge and revolving cards and extended the credit limits of its existing cardholders by billions of dollars.

37.    AMEX's credit cards (and the "lending on charge" program) generated revenue in at least three ways.  In a manner similar to "charge" cards,  credit cards generated "discount revenue" for the transaction fees charged merchants and card fees.  In addition, credit cards generated interest income, to the extent that the interest rates charged cardmembers exceeded AMEX's own costs for financing the loans, including the "provision" expense for the related loss reserves for cardholder delinquencies, and ultimate bad debt write-offs.  Interest income rose $1.7 billion or 29 percent to $7.4 billion in 2007, so that AMEX's business began to more closely resemble that of other credit card issuers, where the interest "spread" was the major source of income, and the credit profile and risk of their cardmembers was a greater factor in the Companies' profitability.

38.    As Chenault stated at an August 1, 2007 "financial community" meeting,[2] on a managed basis, cardmember loans grew by 15 percent in 2005, 17 percent in 2006 and 21 percent from January 1, 2007 through August 1, 2007.  The growth in AMEX's owned loans, *i.e.* the loans for which AMEX retained the credit risk, was even more eye-popping, growing by 23 percent in 2005, 31 percent in 2006 and ***33 percent from January 1, 2007 through August 1, 2007***.  For all of  2007, AMEX expanded cardmember loans by 29 percent on an "owned" basis.

39.    As Chenault bragged at the August 1, 2007 meeting, AMEX's growth was an "exceptional number" and was "even more notable when compared against [the Company's] peers," meaning that growth in AMEX's lending business had far outstripped the growth of its

---

[2] Financial Community meetings consisted of analysts who followed AMEX's stock, and some of the more sophisticated investors who supplied large amounts of the funding for AMEX's liquidity needs.

peers' credit card businesses. While "[p]eers were cutting back on marketing," AMEX "ramped up."

40.     For example, as presented on slides shown at the August 1, 2007 meeting, AMEX's loans grew by 33 percent on an "owned" basis between June 30, 2007 and June 30, 2006.  By contrast, Capital One Financial's loans grew by 3 percent; Bank of America's loans grew by 4 percent, JP Morgan's loans grew by 6 percent; Discover's loans grew by 6 percent; and Citigroup's loans grew by 8 percent.  To put it another way, during this period, AMEX's owned loan portfolio grew between four and eleven times faster than the lending portfolios of its competitors.  Indeed, in each of the six quarters starting from the first quarter of 2006 through the second quarter of 2007, the growth in AMEX's loan portfolio swamped the growth of its competitors' loan portfolios.

41.     Riskier products increasingly dominated AMEX's "owned" U.S. card lending balances.  As AMEX's president, Al Kelly, revealed in an August 6, 2008 meeting with members of the financial community (as reflected in a transcript on the Company's website), during 2005 and 2006 the Company made "targeted acquisitions that increased credit risk modestly," including issuing cards to increased numbers of small businesses and to "cobrand" customers with higher levels of risk.  As CW12 elaborated, small business was known to have significantly higher default rates and constituted more than 20% of the Company's "owned" U.S. lending balance (since AMEX did not securitize the riskier small business cardholder loan portfolio business), an amount that would equal $8.66 billion based on American Express's reported owned loan balance for 2007.   Other CW's reported that, in fact, as time went on, large numbers of riskier cards were issued to riskier cardholders, most notably for the Company's "Blue Card" program.

14

42.    American Express's Blue Card was a major contributor and component in the growth of the Company's lending portfolio.   As of June 30, 2007, loans generated by Blue Cards comprised 30 percent of AMEX's U.S. loan portfolio, a 20 percent increase from December 31, 2004, when Blue Card generated loans comprised only 25 percent of AMEX's loan portfolio. The Company's "lending on charge" programs, where cardholders were known to likely be having financial difficulty paying down their balances in 30 days, were a second major contributor and component of the growth in the loan portfolio, comprising 24 percent of the U.S. portfolio as of June 30, 2007.  And "Cobrand" cards, the group that Kelly had identified, had increased from 27 percent to 30 percent.  Nonetheless, throughout the class period and beyond, despite increasingly more skeptical questioning by analysts, Chenault doggedly insisted that loosened credit standards played no role in the growth of the Company's loans and its deepening loan losses.

4.    <u>AMEX's Securitizations of Cardholder Charge and Lending Receivables and Loans</u>

43.    American Express financed approximately one-third of its U.S. consumer lending receivable balances through asset securitizations, and a smaller proportion of it charge card receivables.

44.    Securitization of cardmember receivables generated for consumer charge card accounts was accomplished through the transfer of selected charge cardholder accounts to the American Express Issuance Trust (the "Charge Trust").  The various tranches of the securitizations were rated by relative risk by the rating companies, and to assure sufficient investor interest in the securitizations, only seasoned accounts with observable credit histories were included in the securitizations.  These securitizations were accounted for as secured borrowings because the Charge Trust was not a qualifying special purpose entity ("QSPE").

Accordingly, the selected accounts being securitized were not treated as sold for accounting purposes and continued to be reported as "owned" assets on the Company's consolidated balance sheets.

45.     Securitization of the Company's loans generated under certain designated consumer lending accounts was accomplished through the transfer of cardmember loans to a QSPE, (the "Lending Trust.")  The Lending Trust was a revolving master trust.  Like the Charge Trust, only seasoned consumer loans from older vintages were include in the securitizations.  As of December 31, 2007, the Lending Trust's assets totaled $36.2 billion. Investors' interest in the trust was $22.7 billion while the Company's interest was $13.5 billion.  Thus, American Express retained a "seller's interest" and the first loss position in the Lending Trust and its securitized accounts.  Defendants disclosed late in the class period that AMEX had transferred its more seasoned consumer accounts to the Lending Trust -- so that the published credit performance metrics of the securitizations were not representative of the level of losses being incurred in AMEX "owned" portfolio of cardholder lending receivables.  Nor, as Defendants belatedly explained, had AMEX transferred the higher risk and more poorly performing small business cardholder loans  to the Lending Trust.

46.     When the Lending Trust securitized certain of American Express' cardmember loans and issued securities to the public, it published prospectuses in connection with the securitizations.  The Lending Trust also, each month, filed Forms 10-D with the SEC which provided detailed information about the credit performance for the securitizations, including, *e.g.*, monthly payment rates, monthly defaults in payments, annualized default rates and delinquencies in buckets of delinquencies from 30-60 days, 60-90 days and 90+ days overdue. The Forms 10-D broke out credit information for cardholder loans issued by vintage year, so that

investors could compare the trends in the most recently acquired debt versus earlier years.  This credit information was far more informative than that published by AMEX for its own portfolio, and in fielding questions about AMEX's credit performance relative to its peers, the Defendants frequently directed analysts to this data -- which, as described above, however, was not representative of its own portfolio's credit problems.  As described by the CW's and in later statements of the Defendants themselves in reconciling the poorer credit performance of the Company, the Lending Trust included AMEX's more seasoned accounts -- *i.e.*, earlier vintages -- which had far fewer problems, and also did not include the far riskier small business loans included in the Company's owned portfolio.

>    5.    Credit Risk and Risk Management

47.    Both AMEX's charge cards and credit cards involved consumer credit risk.  The Company defined consumer credit risk as "the risk of loss from obligor or counter party default."

48.    Credit risk was one of the "fundamental" risks recognized by American Express.  "Given the key role of credit risk in the Company's business model," American Express' Chief Risk Officer "directly supervise[d]" officers responsible for credit risk management.  Thus, throughout the class period, there was a relatively short reporting chain between individuals at the Company who gathered risk-related data and the Company's most senior management.

49.    As explained by CW12, American Express's various business units reported their raw observed credit trends to the Company's risk management group.  In turn, a financial group within Risk Management, which at the time was headed by Tom Toscano, analyzed the data on an enterprise-wide level and came to conclusions regarding loss rate forecasts, roll rates and developments in specific tranches of customers or products.  Toscano then reported such information to his supervisor, Ash Gupta, American Express's Chief Risk Officer.  Ash Gupta, in

turn, reported the information to Al Kelly, who was head of U.S. Card Services, who reported the information to the Company's CFO.

50.     In addition, as explained in American Express's 2007 Annual Report, Ash Gupta, as Chief Risk Officer, was chair of the Company's Enterprise-Wide Risk Management Committee (ERMC). The ERMC worked closely with the Operating Committee, "composed of the Company's most senior executives," to ensure that the Board-approved risk management objectives were fully implemented in all businesses across the Company. Thus, during the class period, American Express's internal risk reporting system created a direct channel for risk information to reach Chenault and Henry.

51.     As described in its 2007 Annual Report, American Express studied and managed consumer credit risk though "sophisticated proprietary scoring and decision-making models." Credit underwriting decisions were made based on "sophisticated" evaluations of product economics and customer behavior predictions. American Express also developed a "unique decision logic" for each customer interaction, including prospect targeting, new accounts, line assignment, balance transfer, cross sell and account management. Each of these decisions benefited from "sophisticated modeling capability that use[d] the most up-to-date proprietary information on customers, including payment history, purchase data, as well as insights from data feeds from credit bureaus."

52.     At a June 2008 Keefe Bruyette & Woods Diversified Financials Conference, Chenault explained "Now our second advantage is risk management. And whether it's approving an application or authorizing a higher line of credit, our process is disciplined and our capabilities are advanced. Our models and expert systems employ a wide range of data, ***data***

*that is specific to a geographic area such as real estate values and also data that is specific to*

*Cardmembers and prospects such as the terms and issuer of their mortgage obligation*".

53.    Similarly, at an August 1, 2007 Semi-Annual Financial Community Meeting, Chenault explained that "[*American Express's] proprietary credit models have advanced far beyond relying on FICO scores as our only selection criteria. Instead, we consider a range of robust factors before making an offer to a prospect. For example, we consider their total size of wallet. We segment a prospect's needs between their spend and revolve capacities, and we look at their home value. By using a wide range of factors, we believe we're far more knowledgeable about a prospect's true creditworthiness before they even join our franchise.*"

54.    Indeed, as CW4 confirms, during the class period, American Express used a variety of sophisticated models employing information about its customers to study credit risk trends in its card portfolio and manage risk accordingly. As reported by CW4, senior executives in American Express's risk management group such as Ash Gupta and Vernon Marshall actively directed the development of ever more complex risk models in an attempt to protect American Express from risk as the Company barreled after growth by selling products to less affluent segments of the population.

55.    In the course of his employment as a computer programmer working for American Express's risk management group, CW4 observed that between 2004 and 2008, the Company turned itself into a "warehouse of information" and profiled customers' risk based on FICO scores, property ownership records, mortgage information, bankruptcies, other debt and employment status. CW4 also observed that the risk management department "aggressively" used "econometric modeling" to assess customers' risk based on their spending habits, balances

and payment schedules.  Per CW4, Gupta and Marshall strove to make this sort of information instantaneously available for use.

56.    CW3 also confirmed that during the class period, American Express had developed powerful, real time, measurements for its risk and for trends among its customers.  For example, CW3 fed financial information to risk modelers "every day" so that they could update their risk models.  Based on this information, American Express had the "total picture" regarding all aging-related information and could pick up trends among customers, such as a sudden drop-off in payments among a wealthy tranche of customers that traditionally had had strong payment histories.

57.    Information from the Company's risk modeling also flowed into the sales and customer service area.  As described by CW2 and CW7, the Company's assessments regarding a particular customer's credit risk would manifest when that customer called the Company in the form of pop up messages.  According to CW2 and CW7, these pop up messages informed American Express's sales and customer representatives that the Company considered a customer to be "high value" or a "frequent caller" or an "influential card holder."  Pop up messages also informed sales and customer representatives about what particular products a customer qualified for in light of the Company's accumulated information and judgment about that customer.

C.    The Subprime and Credit Crisis

58.    During the late 1990s, interest rates for mortgages declined and an increasing number of individuals in the United States obtained access to residential mortgages.  The increase in loan volume and lending to new homeowners spurred a rapid increase in the residential mortgage industry.  The increase in the number of buyers led to an increase in demand that, coupled with low interest rates, fueled a rise in home prices.  Rising prices, in turn,

fueled a residential building boom.  As lenders attempted to reach ever increasing numbers of potential homebuyers, aggressive, often predatory, lending practices by United States lenders led to an increasingly large pool of borrowers whose ability to stay current on their mortgage obligations was particularly sensitive to fluctuations in the values of their homes.  Lenders, for their part, were willing to make ever-riskier loans because mortgage purchasers in the secondary market were so plentiful that lenders who originated risky loans could quickly off-load the loan, thereby off-loading the risk.

59.     As reported in the Wall Street Journal on October 11, 2007, the spread of risky mortgages and housing speculation was widespread in the United States, cutting across various demographic and geographic subgroups.  Risky high-rate mortgages made to borrowers with poor credit histories or with small down payments, including subprime mortgages, accounted for 29 percent of the total number of home loans originated in 2006, up 16 percent from 2004.  About 10.3 million of such loans were made between 2004 and 2007 out of a total of 43.6 million mortgage loans.

60.     Between 2004 and 2006, risky high-rate lending increased sharply in middle-class and wealthier neighborhoods.  As home prices accelerated across the country over the preceding decade, more affluent families turned to exotic loan products (carrying higher interest rates), to buy expensive homes they could not have qualified for under conventional lending standards.  For example, among borrowers characterized as "white" with annual income of at least $300,000, the number of high interest rate loans jumped 74% in 2006.  These riskier mortgage products carried interest rates of three percentage points or more over U.S. Treasuries of comparable duration.

61.     This house of cards began to collapse in mid-2005, when the acceleration of housing prices stalled and missed monthly mortgage payments began to rise.  Homeowners who had over-extended themselves by taking out mortgages featuring exotic terms such as artificially low down payments and "teaser" rates of interest for introductory periods, began to default. These defaults were not limited to borrowers with low incomes or "FICO" scores (*i.e.*, scores issued by credit agencies based on borrowers' credit/payment histories).  Homeowners with unstable and/or unverified higher incomes, with higher FICO scores, sometimes referred to as "Alt A" borrowers also began to default on mortgage loans in increasing numbers.  The collapse of housing prices and the rising defaults in sub-prime and Alt A loans had a cascading effect on credit markets and the escalating but riskier use of credit cards.  As strapped homeowners could no longer leverage the equity in their homes or obtain credit through home equity lines, they turned to the only source of remaining credit -- their credit cards.  And, far more than its peers, AMEX accommodated this demand, by increasing credit limits on its revolving credit cards and growing its "lending on charge" business.

62.     By 2006, housing prices had begun to fall in parts of the country that had seen the largest increases in prices during the boom, many of which were concentrated in California and Florida and other wealthy coastal areas -- where AMEX's customers were also concentrated. As reported in a February 15, 2007 article in Cnn.money.com, the fourth quarter of 2006 ("4Q06") saw a slump in home prices that was both deeper and more widespread than ever before.  As part of its quarterly survey, the National Association of Realtors reported a 2.7 percent decline in prices in the 4Q06 as compared with the fourth quarter of 2005 ("4Q05"), which, at the time, was the biggest year-over-year drop on record.

63.    The S&P/Case-Shiller Home Price Indices (which Defendants in presentations to investors confirmed they used), reports housing statistics, tracking and reporting housing price changes in the residential real estate market of 20 metropolitan regions across the United States. For example, home prices in Los Angeles peaked in September 2006 and, thereafter, declined every month of the class period.  In San Diego, prices peaked in November 2005 and declined steadily from June 2006 onward.  In San Francisco, prices peaked in May 2006 and declined steadily thereafter.  In Miami, prices peaked in December 2006 and declined steadily thereafter. In Tampa, prices peaked in July 2006 and thereafter declined.  In presentations Defendants made to investors on February 6, 2008 and on August 6, 2008, increases in AMEX cardholder delinquency rates directly correlated, by geography, to declining housing values.  *See*, Exhibits A and B.

64.    As reported on August 29, 2007 by Consumeraffairs.com, declines in housing prices sharply accelerated in the first two quarters of 2007.   For the first quarter of 2007 ("1Q07"), the S & P/ Case-Shiller Home Price Index reported significant deterioration in housing prices in formerly red-hot coastal markets such as Boston, Washington, D.C. and San Diego.  For the second quarter of 2007 ("2Q07"), the S & P/Case-Shiller Home Price Index found that housing prices of homes throughout the United States had declined an average of 3.2%.  This historic price drop was the largest drop since the S & P began tracking home price fluctuations in 1987.  An August 31, 2007, an article in the Christian Science Monitor reported that "California, Michigan, and parts of Florida" were among the "biggest decliners."

65.    The decline in housing prices continued in the third quarter of 2007 ("3Q07"), with the country as a whole seeing significant declines.  As reported in a December 27, 2007 article in the New York Times, prices dropped fastest in California, Florida and the Southwest,

23

where the housing boom was the most pronounced.   As an analyst querying the Defendants at AMEX's 3Q07 earnings call on October 22, 2007 observed, one of AMEX's "competitors had said that they had seen an uptick in delinquencies in credit issues in areas" such as "California and Florida."  Nonetheless, in response, Henry continued to assure analysts and investors that there had been no changes in the quality of AMEX's loan portfolio.  According to Henry, AMEX had dodged the bullet, because "we are focused on the prime and superprime areas.  So we have not directly seen an impact from subprime activity at the current time."

66.     Only on January 10, 2008, when Defendants announced a sudden $440 million increase in AMEX's loss reserves, did they first acknowledge that these housing price trends had had any impact on AMEX's own credit losses.  Nonetheless, Defendants continued to under-reserve for losses in the following months for these critical changes.  As reported in a February 26, 2008 article in MSNBC.com, home prices continued their slide in the fourth quarter of 2007 ("4Q07") with some of the weakest markets being Miami, Los Angeles, San Diego, San Francisco and Tampa.  As recorded by the S & P /Case-Shiller Home Price Index, home prices continued to decline nationally, and particularly in California and Florida, throughout the first half of 2008 and the remainder of the class period.

67.     As would later be revealed, as the housing market was collapsing, AMEX was ramping up the riskiest cardholder loans in its portfolio.  As a December 11, 2008 article by Deutsche Bank reported, in the prior two years, Amex had ramped up "subprime" credit-card loans by 2/3rds, to a total of $7.5 billion, or 17% of its managed U.S. loan portfolio.  In light of these statistics, Deutsche Bank then further reported that, it was "skeptical" of AMEX's reports that it had implemented disciplined underwriting consistent with its higher quality standards elsewhere in the company.

68.    In a recent article issued September 17, 2009, Business Week similarly reported that AMEX's foray into subprime lending had harmed the Company -- "AmEx, its gold-plated reputation tarnished by subprime bets, wants to regain the trust of its customers."

**D.    AMEX's Lagging Write-Offs and Understated Loss Reserves**

69.    Pursuant to Generally Accepted Accounting Principles ("GAAP"), and particularly Statement of Financial Accounting Standards ("SFAS") No. 5 ("SFAS #5") and SFAS No. 114, credit card companies, such as AMEX, are required to report their cardholder receivables and loans at "net realizable value."  This means that bad debt or other loss reserves must be established when revenue is recorded and the receivable or loan is put on the company's books, and the reserves must be updated on a regular basis to reflect "impairments" in the assets' collectibility, "in light of the current economic environment."

70.    For financial reporting purposes, AMEX recognized expense on its financial statements and reduced the reported net value of the cardholder receivables and loans, when it periodically increased its loss "provisions."  "Write-off's" of particular uncollectible cardholder accounts occurred much later.  As reported in the Company's Form 10-K's, unless a cardholder declared bankruptcy or died, delinquent balances for charge cardholders were "written off" 360 days after they first became past due, and delinquent balances for "credit" cardholders, *i.e.*, those with revolving accounts where a cardholder's minimum monthly payments of 2% of the principal balance and interest was all that was needed to classify the account as "current," were "written off" 180 days after the account became delinquent.

71.    AMEX's "risk department" headed by Ash Gupta, working with the accounting group with AMEX's U.S. Card Services' department headed by Al Kelly, set the amounts of AMEX's U.S. quarterly "provisions."  In making the assessments of the level of loss attributable

to current cardholder balances, these groups had literally billions of pieces of up-to-the-minute purchasing and payment data which was compiled into statistical reports. This data along with other details affecting the credit profiles of AMEX's cardholders, were aggregated and assessed by a patented system which Chenault referred to as AMEX's "share of wallet" technology. Through AMEX's sophisticated computer systems, Defendants knew cardholders' financial circumstances, including changes in cardholders' income and values of their homes by geographical area, rates at which cardholder accounts became 30 days delinquent, their delinquency "roll rates," and other details which demonstrated that the loss reserves AMEX was setting were inadequate. For example, as Al Kelly explained during his August 6, 2008 presentation, when there was growth in the number of accounts that first began falling 30 days past due, that was "an early indicator of problems to come." Similarly, as Confidential Witness #12 explained, the factor that had compelled AMEX to boost loss reserves as announced on January 10, 2008, was not an unexpected increase in the rate of "write-offs," but rather the fact that in December 2007 AMEX's cardholder "spend" had fallen off the cliff.

72.    In addition, AMEX compiled its delinquency data by "vintage year," so that it could see developing trends in payments and delinquencies for receivables and loans created at different points in the economic cycle, and when shifts in underwriting standards had occurred. As one CW in the finance area of U.S. Card Services explained, the accumulated payment data and risk models they developed were so sophisticated and current that "they could forecast a recession a year before even the most sophisticated financial analysts noticed."

73.    Nonetheless, as reported in the Company's Form 10-K's, in setting the amounts of provision expense reported on its quarterly financial statements, the Company used analytic models which took into account "write-off rates" developed over the past 24-month period -- *i.e.*,

in large part during 2006, when the economy was booming and bankruptcies were rare as a result of changes in the bankruptcy laws in fourth quarter 2005.

74.     As a result, despite the massive information that its cardholders' home prices had plummeted during the first three quarters of 2007, underwriting standards had weakened for recent vintages, and delinquencies had already sharply trended up, AMEX ***reduced*** the rate of its provisioning for loss reserves for 3Q07.  For 3Q07, as compared with third quarter 2006 ("3Q06"), loss reserves for charge card holders were ***reduced*** from 2.7% of receivables to 2.6% of receivables.  This downward shift in setting loss reserves was even more striking with respect to the level of reserves set for AMEX's severely delinquent charge card holder accounts -- AMEX reduced its charge cardholder reserves as a percentage of 90-day plus past due accounts, from 97% to 91%.

75.     AMEX also reduced the rates of its provisioning for delinquent "credit" card holder loss reserves in 3Q07.  Whereas in 3Q06, reserves had been set for 106% of delinquent accounts, by 3Q07 the reserves were reduced to only 97%.  These changes in provisioning rates had the effect of reducing the Company's reserves by $200 million.

76.     AMEX's actions to reduce reserves in 3Q07 played a significant role in its need to reverse course and sharply increase its loss reserves in 4Q07 by $440 million.  Though AMEX professed to the market that it had sharply increased reserves because it had been caught unawares by sudden increases in write-off rates, in fact, given the enormous amounts of up-to-date information they had and the reduction of reserves in 3Q07, Defendants had been knowingly under-reserving in earlier periods.

77.     Similarly, in first quarter 2008 ("1Q08"), despite the current up-to-the-minute data it compiled, AMEX again under-reserved, so that, in second quarter 2008 ("2Q08"), the

Company again announced a massive "surprise" reserve increase.  In large part, as a result of

AMEX's pattern of under-reserving for cardholder losses and then catching up in later quarters,

U.S. Card Services reported the following gyrations in its net income, in millions of dollars:

| 3Q07 | 4Q07 | 1Q08 | 2Q08 |
|------|------|------|------|
| $601 | $7 | $523 | $21 |

Because of the breadth of AMEX's credit information, and the fact that reserves should have

been set on the basis of recent trends that were capturing changes in the economy, the economy's

deterioration cannot account for fluctuations of this magnitude.

78.    As AMEX would later reveal, its under-reporting of credit losses had occurred, in

large part, because it had been using lagging and non-representative write-off data to set the

reserves.  Thus, *e.g.*, the U.S. Cardmember Lending "Owned" business' net write-off rate

increased from 4.7% of cardmember loans in January 2008 to 7.3% in June 2008; on a

"managed" basis, the rate increased from 5% to 6.8% during this period.  These changes in rates

implicated billions of dollars in credit losses.  As the Company would announce in reporting its

fourth quarter 2008 ("4Q08") results, when, as a result of becoming a bank holding company, it

was forced to change its write-off policy to write off delinquent charge cardholders' balances

when they were 180 days past due instead of when they were 360 days past due (as AMEX had

been doing), this change alone caused an additional $341 million of losses that were reported for

that quarter.  This $341 million of losses should have been reported in earlier quarters during the

Class Period -- *i.e.*, these losses would have been recognized within the Company's increases to

its provisions had the Company merely been reserving for charge cardholder delinquencies on

the same basis as its past due credit card debt.

79.    In addition to grossly under-reserving for its credit losses on an on-going basis,

Defendants misled investors and analysts about the Company's growing credit losses by

selectively presenting stale credit metrics.  Despite the massive amounts of internal current data reflecting the impact of the changes in the economy and in the changing credit profile of its cardholders for recent charge and loan vintages, to convince investors (and the rating companies) that the Company had its growing credit losses under control, Defendants repeatedly made misleading presentations about its lagging "write-off" rates and trends that failed to capture its current experience and changes in the economy.

**E.      Defendants Admitted They Had the Real Time Data to Accurately Disclose Growing Credit Losses**

80.      For the entire class period, AMEX collected and analyzed real time information about the financial circumstances of its customers that would have put it on notice that its risky lending practices and exposure to the housing market were rapidly eroding its customers creditworthiness.

81.      As explained by Gary Crittenden, AMEX's Chief Financial Officer at the time, on a January 22, 2007 earnings call,  AMEX closely studied the financial circumstances of its customers:

> "Domestically as I have said in prior calls, you know, we have developed under Ash Gupta's leadership really some very good capability to make judgments about where you can extend credit line wisely and where you can't, looking at the full set of factors about a customer. How indebted they are on other products. The way they pay us on other products they might have with us. Their total size of wallet compared to the amount of indebtedness that they have to us."

82.      According to Crittenden, this searching scrutiny by AMEX's risk management group of its customers' finances provided "a real in depth understanding of what the capacity is of our customers to repay us" and an understanding of "what their loan capacity is, what their receivable capacity is."

83.    Similarly, on May 24, 2007, Chenault and Henry met with analysts at CIBC and proclaimed that AMEX's technology was "best in class."  Tellingly, Chenault and Henry explained that American Express's "management monitors spend volumes daily if not hourly as it is the key to its 'spend centric' model."

84.    At the same May 24, 2007 meeting, Chenault and Henry noted that AMEX's charge card business provided the "First Read on Consumer Credit" because, unlike its peers, AMEX issued "charge" cards (as well as revolving cards) which required full payment each month:

> "***AXP Gets First Read on Consumer Credit***.  AXP's charge card requires payment in full each month.  Therefore, if cardmembers begin to miss payments, it is clear and noticeable to AXP.  More importantly, AXP gets an early read on when the consumer credit cycle is turning compared to traditional lenders who do not see consistently delinquent payments until after 6 to 12 months.  ***Armed with an early indication of the credit cycle***, AXP management can shift its strategy by changing its product mix, investment allocations, and collections and card and card features."

(Emphasis added)

85.    At the August 1, 2007 Semi –Annual Financial Community Meeting, Chenault affirmed that that AMEX was closely tracking the financial circumstances of its customers, including the value of their homes, so that its knowledge of the current credit-worthiness of its cardholders went well beyond the information provided by FICO scores which were not timely updated:

> Now I should note that these ***FICO scores are actually an outcome of our acquisition methods rather than an input.  Our proprietary credit models have advanced far beyond relying on FICO scores as our only selection criteria.***  Instead, we consider a range of robust factors before making an offer to a prospect.  For example, ***we consider their total size of wallet.  We segment a prospect's needs between their spend and revolve capacities, and we look at their home value.***  By using a wide range of factors, we believe we're far more knowledgeable about a prospect's true creditworthiness before they even join our franchise.

(Emphasis added)

86.     And this theme, that AMEX internally had credit information beyond that publicly available, was picked up by analysts in their reports.  As explained in an August 1, 2007 CIBC Analyst report covering the event, "Management explained that FICO scores are not the be-all and end-all metric in underwriting; thus, a small portion of the portfolio has FICO scores under 660 as other factors such as size of wallet, spend levels and home values determine the customer's creditworthiness."

87.     Along similar lines, on an October 22, 2007 Earnings Conference Call, Henry stated that American Express had "built very strong credit capabilities, and those capabilities will monitor very closely what is taking place within the portfolio" and, for this reason, the Company would react "appropriately to any changes in the credit environment."

88.     Accordingly, throughout the Class Period, the Defendants actually knew the facts requiring them to increase the Company's loss reserves or recklessly failed to check them in setting the loss reserves and in assuring investors that the credit quality of AMEX's loan portfolio had not deteriorated.

**F.    American Express' Enormous Funding Requirements and Need to Sustain Its Credit Ratings**

89.     AMEX's credit and charge card businesses required significant outside funding. As described in its 2007 Annual Report, AMEX's "most significant borrowing and liquidity needs are associated with its proprietary card businesses."  The reason for this was that AMEX paid merchants, usually within days of when charge and credit card holders used their cards to make purchases.  AMEX then had to wait for reimbursement from the card holders, which, depending upon what type card was used, could come at the end of the month following

AMEX's monthly bill including the cardholder purchases, or over an extended period, depending upon how quickly credit card holders paid down their balances.

90.    The explosive growth in AMEX's lending business during the class period aggravated the Company's financing needs, forcing it to expand its funding programs aggressively.  Between 2006 and 2007, AMEX's total debt expanded by $17.7 billion from $78.1 to $95.8 billion, an increase of approximately 23 percent.

91.    However, unlike many of its competitors such as Bank of America, Citigroup, J.P. Morgan, AMEX was a mono-line "non-bank" specialty finance company.  Accordingly, unlike its competitors, AMEX could not rely on a large base of deposits to finance the bulk of its card activity.  As described on October 14, 2008 in an analyst report from Barclays Capital, AMEX had only $15 billion in deposits whereas its funding needs necessitated $116 billion in financing. For this reason, AMEX relied on the capital markets for the "majority" of its funding.

92.    AMEX had both short-term and long-term financing needs.   The Company's long-term  financing came principally through the sale of senior unsecured debentures and securitized assets in the capital markets as well as short- and long-term bank borrowing facilities. Because billions of dollars in debt matured every year and because of the growth of its business, AMEX needed to raise billions of dollars every year.  As the Company disclosed on March 12, 2008, in 2006, AMEX issued $26.6 billion in unsecured debt and $3.5 billion in asset-backed securities.  In 2007, the Company issued $21.5 billion in unsecured debt and $8 billion in asset-backed securities.  On March 12, 2008, the Company explained that it planned to raise $35 to $40 billion in 2008.

93.    The cost of this financing depended in significant part on AMEX's own credit ratings as issued by the major rating companies, including Moody's, Standard & Poor's and

Fitch. For its securitizations, ratings depended upon the quality of the particular cardholder accounts placed into the Trust and which were securitized. Indeed, as American Express admitted in its 2007 Annual Report, "Credit ratings have a significant impact on the borrowing costs of the Company." Moreover, "a decline in the Company's long-term credit rating by two levels would result in the Company having to significantly reduce its commercial paper and other short-term borrowings." In turn, Moody's, Standard & Poor's and Fitch based their credit ratings in large part on the perceived value and strength of American Express' assets and collateral, principally its cardmember receivables and loans. For example:

- On May 18, 2007 Fitch affirmed the Company's long-term Default Rating (1DR) at A+ and short-term rating at "F1", reporting that the Rating "outlook" is stable, and that approximately $81.3 billion of debt is affected by this action. According to Fitch's report, its affirmation reflected American Express' "strong franchise, solid growth and market position in the charge and credit card industry, peer-superior asset quality, consistent operating performance, diverse funding base, and stake risk-adjusted capitalization."

- On April 28, 2008 S&P reported a "hold" opinion on shares of American Express. S&P noted that the Company's "credit quality deteriorated, as 90-day past due accounts totaled 3.3% of receivables, compared to 3.0% in the fourth quarter, largely due to a weakening U.S. housing market.

- On May 16, 2008 Fitch affirmed its 1DR at "A+", and that AMEX's outlook was stable. Fitch further reported that the "Outlook reflects the expectation that consumer credit metrics will continue to worsen over the remainder of 2008; although Fitch believes AXP is in a better position to deal with a deteriorating consumer credit environmental, relative to peers, given its attractive customer profile and sophisticated risk management capabilities. However, deterioration of asset quality metrics combined with significant declines in profitability, and or a weakening funding and capitalization profile, could result in negative rating action."

- On July 24, 2008 Standard & Poor's revised its outlook on American Express to "negative" from "stable" after it reported a steeper than expected profit decline. "Results were hurt by deteriorating credit quality, resulting in a $600M U.S. credit reserve and a $136M charge to reduce securitization income."

- On August 7, 2008, Moody's Investor's Service placed American Express's credit rating on review for a possible downgrade, "reflect[ing] Moody's concerns over Amex's asset quality trends and lending exposures, particularly within geographic markets in the United States that have experienced sharp home price declines."

- An August 15, 2008 Dow Jones Capital Market Report reported that "American Express Credit Corp. is seeking to raise at least $1B[illion] through the sale of a new five-year bond issue, but is offering a significantly higher yield than on its previous deals to entice investors."  "The new bond's risk premium is typically seen on bonds rated Ba1, the first rung in the speculative-grade ladder, according to Moody's Market Implied Ratings Service."

94.    AMEX's costs for its issuance of commercial paper and its bank loans were directly related to its credit rate because the ratings determined the interest rate AMEX would need to pay.  There is a spread (increase) between the interest rate of the issuer as compared with AAA rated issuers of commercial paper and bank loans that causes the company to pay greater interest rates on reissuances.  Some bank loans may have automatic interest rate adjustment for debt ratings changes at certain thresholds.  Whenever the bank debt and commercial paper must be refinanced, the interest on the new debt will exceed the interest rate on the old debt just as the interest rates on the publicly-issued debts increased over time.

95.    The viability of financing through the securitization of asset-backed securities, such as American Express's credit card loans, also turned on market perceptions of the strength of its cardholder loans.

96.    As explained in a December 10, 2008 Citigroup analyst report, AMEX's asset securitization was a "key source of low cost capital."  This cheap capital helped AMEX compete with its competitors such as Bank of America, Citigroup and J.P. Morgan who could draw upon customer deposits for financing.  But, financing through the securitization of loans becomes significantly more expensive, and might become completely unavailable, where the market perceived heightened credit risk in the underlying loans.   For example, if the market perceived that a credit card issuer had issued credit cards to customers who,  for some reason, were less likely to pay their loans, the market would demand extra protection in the form of higher interest

rates before purchasing that credit card issuer's asset-backed securities.  In times of economic

duress, the market might refuse entirely to purchase securities backed by high risk loans.

97.    As it admitted in its 2007 Annual Report, AMEX experienced these dynamics in

the "second half of 2007" when "disruptions in the capital markets" threatened the Company's

ability to access the debt and asset securitization markets, prompting the Company to caution

that "***a lack of investor demand*** in sectors of the debt capital market, such as for 1-to-5 year

unsecured floating rate debt or the A- rated and BBB- rated tranches of the card securitization

market could alter the Company's funding mix."

98.    Because of its crucial and precarious nature, AMEX's ability to find financing

was a focus of investor discussion during the Class Period.  For example, an October 20, 2008

Reuters article indicated that American's Express's "model of relying on market funding" was a

vulnerability and quoted from a Moody's report stating that "[t]he current credit crisis has

highlighted the risk to firms that rely on wholesale funding, both in terms of availability and

cost."  Similarly, an October 14, 2008 Barclays Capital analyst report noted that funding costs

could put "meaningful pressure" on AMEX's margins and focused on the fact that it had become

increasingly expensive for AMEX to finance itself through the securitization of assets or the

issuance of unsecured debt.

99.    In fact, by November 2008, AMEX's inability to continue to fund its credit card

business had become so critical, that its survival was accomplished only through its conversion

to a bank holding company and a $3.5 billion bail-out of taxpayer-funded capitol.

## G.    The Confidential Witnesses

100.    Confidential Witness # 1 ("CW1") was a credit analyst working in American

Express's Salt Lake City facility from 2006 to 2009.  The Salt Lake City facility originated all

new AMEX cardholder accounts and ran credit checks for the approval of the new accounts and

credit lines for AMEX cardholders.  CW1 worked primarily on the approval of new accounts and

line of credit increases on existing AMEX credit cards.  She also did a lot of work assessing

balance transfers from other credit cards to new American Express credit cards, like the Blue

Card.  Prior to working as a credit analyst at AMEX, CW1 had worked as a loan officer so

understood FICOs and credit policies of other companies.

101.    CW1 explained that when someone applied for an AMEX card, she would

perform a credit check, which included analysis of the person's FICO scores as well as the

person's debt to credit ratio and late payments.  CW1 stated that the Company also considered

how much revolving credit a consumer already had and whether there was unused credit that was

already available to the consumer.  According to CW1, at AMEX the debt to credit ratio was an

important factor in its underwriting process and a factor that AMEX weighted differently than

other companies.  Whereas some companies might consider a low level of outstanding debt

compared to available credit a positive, American Express was more interested in granting credit

to consumers who were using most of their available credit because the Company was looking

for people who were "spending a lot of money."  Even if such people posed a higher credit risk,

they were the sort of people who would use American Express cards more frequently and

thereby make American Express more money.  For these reasons, a potential customer had a

better chance of getting a card from American Express if he was using his existing credit cards

already (thereby having a higher debt to credit ratio).

102.    CW1 stated that in 2006 and 2007, credit was much easier to get than it later years

and recalled that people with FICO scores in the low 600s were being approved, while by 2008

people with FICO scores in the 800s were being declined.  In 2006 and 2007, American Express

was very aggressive about extending credit and raised limits on credit cards "pretty freely." Most of the cards that were issued in 2006 and 2007 were revolving credit cards as opposed to charge cards.   CW1 said that requirements were most relaxed in 2006 and she remembers approving cards for people with FICO scores as low as 550 at that time.

103.    CW1 recalled that the Blue Card was extremely prevalent in 2006 and that "everyone wanted the Blue card" because it had extremely favorable incentives for balance transfers, offering 0% interest for balances transferred from non-AMEX cards.  By contrast, the Company's Clear card was less popular because, though its features were essentially the same as the Blue Card, the balance transfer options were not as attractive.  CW1 handled a large number of balance transfers to Blue Cards.

104.    CW1 recalled that the Company's card holders and callers skewed heavily toward California and Florida and that she and other credit analysts discussed this fact.

105.    Confidential Witness # 2 ("CW2") was a customer service / sales representative in AMEX's Fort Lauderdale operations center from 2004 to 2006.  The Fort Lauderdale office was one of the Company's main customer service centers.  During his time at the Company, CW2 he took incoming customer calls, dealing with both new and existing customers.  CW2 primarily dealt with billing and service issues and "up selling" new card and products to callers.

106.    CW2 explained that when a customer called, information about what products that customer could qualify for would automatically pop-up on CW2's screen.  For example, if someone was qualified for a "sign and travel" option, a computer program would call up this information and give it to CW2 automatically so that he could try and "up-sell" the customer on that option.  There would also be a button on the side of the computer that indicated how much of a bonus CW2 would earn if he succeeded in convincing the customer to accept the "sign and

travel" option.  CW2 observed that AMEX was making an aggressive push to increase the sale of

revolving credit, including the "sign and travel" option on charge cards.  As evidence of this

push, CW2 pointed to the fact that when he started his job, AMEX offered 1000 bonus reward

points to entice customers to sign up for "sign and travel" but that, later in his time at the

Company, those incentives increased to 2500 bonus reward points.

108.    CW2 explained that the "sign and travel" program was the revolving line attached

to charge cards that allowed all charges of over $200 and any travel related charges to go into a

revolving credit line as opposed to be being paid in full at the end of the month, as was the

traditional case with charge cards.  The Company then applied a 17.9 percent interest rate to

balances placed on these revolving lines, which was higher than many of the interest rates that

AMEX typically applied to its other credit cards, such as Blue.  CW2 added that if a charge card

customer had a sign and travel option, he or she could very easily transfer over any charges to

the sign and travel revolving balance, even if a charge did not technically fall within the

parameters of the sign and travel program.  This could be done by calling a service representative

and could possibly be done on-line as well.  CW2 remembered transferring charges as low as

$10 to the sign and travel balance.

108.    During his time at AMEX, CW2 saw people with "ridiculous balances" who were

allowed to get a sign and travel credit line.  CW2 believed that some of these people had trouble

paying the full balances of their charge cards and used the sign and travel option to finance their

charges.  Moreover, while CW2 worked at the Company, there were no spending limits on

charge card products, including the sign and travel revolving credit line.

109.    CW2 also observed the Company issuing credit to other groups of high risk

individuals such as "new employees, kids in their late teens and early twenties," and people with

short credit histories.   Furthermore, CW2 observed that the main selling point of the Blue card was the 0% interest balance transfers from other non-AMEX cards.  He said that on average, customers were given 0% interest for 12 months on the balances transferred to Blue cards.

110.    CW2 noticed that the growth in AMEX's products leaned heavily toward revolving credit products as opposed to its more traditional charge cards and stated that with the growth of sign and travel program for charge cards, AMEX's products were "all revolving now."

111.    Speaking about revolving balances, CW2 believed that a minimum of 2% of the total revolving balance had to be paid on a monthly basis and the remainder would continue to get charged a high annualized interest rate or "APR."

112.    CW2 noted that "delinquent" consumers were transferred to another group and not dealt with by his group.  CW2 defined  "delinquent" as being over 90 days late.  He said that accounts that were 30 days late were considered "past due" and that accounts that were 60 days later were defined as "over-due."  CW2 understood that a customer who was 30 days late could transfer balances from a charge card to a sign and travel revolving balance.

113.    Confidential Witness # 3 ("CW3") was a senior executive in the finance area of AMEX's consumer card division from before 2000 until "about a year or two years ago."  He worked at the Company's headquarters in New York, and interacted with the Company's controller  As part of his job responsibilities, CW3 "fed" financial information related to aging accounts/ delinquencies to risk modelers "every day" so that they could create current risk models.

114.    Based on this experience, CW3 stated that, with regard to day-to-day operations, AMEX could "see anything anywhere" and had the "total picture" when it came to knowing all aging-related information for the company's credit customers.  Furthermore, AMEX knew about

its bad debt at all times.  As CW3 explained "Who paid on time? Who paid slowly? Who didn't pay?  We knew."

115.    CW3 described Chenault's statements touting the FICO scores of its customers as "half-truths."   CW3 also stated that, over the course of customers' tenures, it was not uncommon for the FICO scores of AMEX's customers to decline significantly from the initial score that had justified the Company's original decision to extend a charge or credit card.

116.    CW3 stated that because of careful analysis and research, AMEX knew customers' ages, where they went to college, their phone bills, their gas bills, their mortgage payments and what grocery stores they shopped at.  Accordingly, CW3 stated that his department was able to forecast a recession a year before even the most sophisticated financial analysts noticed.  CW3 explained that the reason for this was that AMEX's risk models were so current and sophisticated and aging accounts were so carefully watched, that AMEX would quickly pick up on any trends among its customers.  For example, AMEX would know if there was a trend of wealthy customers earning more than $100,000 a year who were becoming late in their payments.  When a significant number of historically safe high-end customers began to slip, this was a red flag indicating recession.

117.    Confidential Witness # 4 ("CW4")  worked for AMEX for more than two decades and moved his way up to a senior management position in the technology side of the Company's business.  CW4 left the company in 2009.  During his time at the Company, CW4 generally worked as a computer programmer in support of the risk management department.  His job responsibilities included building risk models that assessed the credit risk of AMEX's customers using different aspects of customer-related information.

118.    CW4 described how in the mid-1990's, American Express moved toward a more organized and formidable risk management group.  In the early 2000's, this effort gained momentum  as the Company rapidly expanded efforts to track customers' financial status, liabilities, spending habits and "basically their life story."

119.    During his time at the Company, CW4 worked at the direction of senior executives in the Company's risk management group, including  Ash Gupta and Vernon Marshall.   CW4 knew both of these gentlemen for years and, in his opinion, they had significant influence with Chenault and were a "driving force" behind the expansion of AMEX's risk management capabilities.

120.    Between 2004 and 2008, Gupta and Marshall searched for additional ways in which AMEX could find out as much as possible about every single customer or potential customer and organize that information so that it would be instantaneously available.  AMEX became a "warehouse of information," amassing information such as FICO scores, property ownership records, mortgage information, bankruptcies, other debt and employment status.   The technology department, including CW4, then took this information and created risk models to assess the risk posed by each customer.  Additionally, AMEX increasingly and "aggressively" used "econometric modeling" to assess customers' risk based on their spending habits, balances and payment schedules.

121.    Gupta and Marshall were constantly asking for different models that used different variables.  For example they might ask for models taking into account late payments, job losses or the purchase of a new home.  If such models indicated that a customer was high risk, that customer's account might be closed or the interest rate applied to the customer's balances might increase.

122.    CW4 believed that the motivation for Gupta's and Marshall's drive for information and modeling was a directive from Chenault to find ways in which AMEX could expand beyond its traditionally high prestige charge card products and increase profits by offering more down market products.  For example, by the early 2000s, CW4 stated that AMEX had changed its business model to offer revolving credit cards to a wide segment of the population.   Between 2004 and 2007, the Company accelerated its campaign for new customers and by 2005/2006, American Express was offering over 100 different revolving credit cards, each card marketed to a different customer base depending on numerous variables.  Additionally, CW4 said that revolving credit cards with no yearly fees were offered, in some cases with 0% interest, which enticed new customers.  These strategies for going after down market customers meant that Gupta and Marshall had to limit risk as much as possible by closely analyzing customer data.

123.    CW4 described one instance in which his department had been asked to create "student models" to determine the risk of giving new college graduates revolving credit cards. The Company theorized that recent graduates would have good credit habits if they were already paying student loans.  The models indicated that recent graduates were very high risk because they did not have adequate income and did not have a sufficient credit history demonstrating an ability to handle a credit card.  Nevertheless, AMEX launched an initiative to extend cards to students.

124.    CW4 labeled the Blue cards as "subprime" because the Company's modeling showed that the customers who held these cards were higher risk than AMEX's traditional charge card customers.  CW4 also stated that AMEX had lowered its criteria for extending revolving credit cards to customers and potential customers.

125.    CW4 stated that the FICO scores for many AMEX customers declined over their tenure as card holders because they allowed their cards to become delinquent.  If modeling suggested a deterioration in a customer's risk profile, AMEX would sometimes encourage that customer to move debt from AMEX accounts to the accounts of other credit cards.

126.    In working with models and internal operations, CW4 noticed that AMEX was "sitting on a lot of debt that existing customers were not paying" and that much of AMEX's recent business difficulties stemmed from the inability of the Company's newest customers to pay.  Customers with revolving credit "were the big problem."

127.    CW4 stated that the sign and travel program was initiated as a way for charge card customers who could not pay off the full balance of a month's charges to extend their payment schedule.

128.    Confidential Witness # 5 ("CW5") was a senior executive in the lending area of AMEX's consumer business from 2007 to 2009.

129.    CW5 stated his belief that the Blue card was AMEX's worst performing product. He noted, however, that charge cards were actually more risky because the numbers were higher on the charge cards and there were no spending limits, whereas on the revolving side, the receivables were generally lower because you had spending limits or caps on these cards and because you could monitor a consumer's behavior and cut them off if they got late on payments, before they accumulated large balances.

130.    CW5 stated that AMEX was constantly using its own forecasting models to better predict what might happen in the future.  He said that one problem with FICO scores was that it was a lagging metric.  In the course of his job responsibilities, CW5 worked with risk management and became familiar with the practices in that group.  CW5 observed that risk

43

management used all available data to come up with "predictive models" and that they used "rigorous data updating to drive underwriting decisions."

131.    Confidential Witness #6 ("CW6") was an account executive at a subsidiary of AMEX that specialized in pre-paid card offers from 2004 to 2007.   One of the products that CW6 worked on was pre-paid cards that AMEX would offer to delinquent credit card customers in the hopes of getting those customers to pay down a portion of their debt.

132.    CW6 opined that in his experience, AMEX maintained a culture of "internal inflation" pertaining to both financial figures and accomplishments.  CW6 explained that AMEX had a practice of inflating or overstating its success to the public.  For example, if he attended a meeting in which he learned that direct mailings had a 5.5% return, AMEX's public statement would proclaim that the same direct mailings had a return of "around 6%."  As a second example, CW6 indicated that he noticed that AMEX executives often ordered large and unwarranted numbers of pre-paid cards for the Company's various programs that were based on inflated numbers that were presented to the public rather than on what was, in fact, real.

133.    By 2007, CW6 noticed that AMEX's Consumer Division was ordering more pre-paid cards to offer to delinquent customers.  This raised a concern for CW6 that AMEX was misleading the public about its increasing delinquencies.

134.    Par.    Confidential Witness # 7 ("CW7") was a customer representative / sales representative at American Express's Fort Lauderdale offices from 2005 to 2009.  CW7 initially worked with cobrand cards, including cobrand cards associated with Delta Airlines, Starwood Hotels, Hilton Hotels and Costco.  Later in her time at the Company, CW7 also worked with Platinum charge card holders.

135.    In CW7's experience, AMEX's charge card customers were more sophisticated and credit worthy than customers holding revolving credit cobrand cards. This distinction was also reflected in the sales incentives offered by the Company with charge card accounts being worth more than cobrand lending accounts.

136.    CW7 stated that when customers called, pop up screens on her monitor would inform her of additional card products and offers that she could offer to that customer. The offers would generally be for cards that were compatible with the customer's existing cards. For example, if a customer had a Gold charge card, the pop up screen might suggest a Blue lending card. Often, there would be additional special incentives for customers to take the pop up offers, such as no interest for 15 months to entice customers to obtain new Blue cards. In addition, CW7 would receive payments for each product she sold. For example she might receive $20 for every Blue card she sold to customers.

137.    In addition, CW7 recalled that messages like "high value," "frequent caller" and "influential card holder" would appear on her screen when customers called.    These messages provided CW7 with additional information about the customers that she was speaking with.

138.    CW7 stated that she was highly incentivized to sign charge card customers up for revolving "sign and travel" credit lines and might receive a bonus of $25 for each such line opened up. The reason for this was because interest rates were very high on sign and travel credit lines. All incentives were pre-determined by the Company and popped up on the screen when a customer was calling.

139.    In CW7's experience, the Company's incentive program heavily pushed the growth of revolving credit. For example, in 2005/2006, CW7 might only receive $9 for opening a sign and travel credit line while by 2007/2008, CW7 would receive $25.   It was apparent to

45

CW7 that there were clearly too many lending cards being issued and CW7 remembered seeing accounts having as many as ten lending cards. CW7 also noticed that revolving credit card customers generally had lower credit scores than charge card customers and that income level and job requirements were less demanding for revolving credit cards. For these reasons, many individuals who received revolving credit cards could not have qualified for the Company's charge cards.

140.    By late 2008, CW7 believed that American Express was offering gift cards of up to $300 to customers so that they would close their accounts.

141.    Confidential Witness #8 ("CW8") worked at AMEX for over ten years and left the Company in early 2008. During her time at AMEX, CW8 was a "team leader" and managed a team of fifteen people in the customer service center in Fort Lauderdale.

142.    CW8 said that AMEX started to change its approach to winning customers between 2003 and 2006 and "lowered [its] standards" for issuing credit in 2004 or 2005. CW8 experienced the effects of this first hand because the caliber of callers to the Fort Lauderdale center shifted, with callers becoming less wealthy and less credit-worthy.

143.    In CW8's experience, it was common practice for the Company to offer additional cards to people with questionable payment history. For example, when a customer called in with a questions about his account, the customer representative would open the account information and frequently see past due balances or a history of late in payments. Nevertheless, a screen would pop up on the customer representative's screen indicating that the representative should offer the customer additional cards. Oftentimes, such problematic customers had Gold charge cards and were offered a Blue card to add to their revolving credit.

144.    CW8 observed that AMEX started to lower limits on cardholders in mid-to-late 2007.  This was the first time that CW8 had ever seen the Company do this.  The new policies were communicated through a memorandum from the Company's New York headquarters.

145.    CW8 stated that there were daily meetings where management went over numbers such as delinquencies.  These numbers were shared with managers such as CW8 on a monthly basis.

146.    Confidential Witness # 9 ("CW9")  was a manager in AMEX's marketing department from 2003 to 2009.  She spent several years working in consumer card marketing, working with the Green, Gold and Platinum cards and with the Blue and cobrand cards.  Her position involved developing television media strategy, monitoring telephone service centers and using other forms of media to market new card products.  CW9 stated that the Company's lending on charge program was designed to take the pressure off charge card holders who were having difficulty paying off their balances.

147.    Confidential Witness # 10 ("CW10") was a manager at a company hired by AMEX to provide customer service for existing AMEX accounts that were 30 to 90 days delinquent.  Once the accounts were more than 90 days delinquent, they were sent to another company for collection.  CW10 worked at the company from 2002 to 2007.   In the course of her work, CW10 interacted with the risk management group at AMEX.

148.    CW10 reported that her company began to see more delinquencies from Blue cards in 2006 and 2007.

149.    CW10 described a project implemented by the risk management group at AMEX in 2003 or 2004 to deal with customers who had a significant drop in credit scores.  When this occurred, the account would have its credit line reduced.

150.    CW11 was a marketing manager at AMEX from 2005 to 2007. His job involved promoting AMEX to small businesses and trying to generate as many applications for cards as possible. CW11 explained that he was paid according to the volume of applications he generated. The applications he generated were then sent to the risk management group for evaluation.

151.    CW11 stated that much of his work involved "cross-marketing" lending cards to existing customers who already had charge cards. Thus, much of the growth in AMEX business that he witnessed came through the sale of lending products.

152.    Confidential Witness #12 ("CW12") was a senior executive in AMEX's Finance Department at its New York headquarters. He worked at the Company from 2004 to 2008 in the area of planning and analysis. CW12's responsibilities included collecting performance data from the Company's business units and, based on this data, formulating a rolling six-quarter forecast for the Company's business planning. The reports CW12 helped prepare were presented to American Express's "C-Level" management, which included the Company's highest executives, such as Chenault, Henry and Gupta.

153.    As another part of his job responsibilities, CW12 also compiled comparative performance data from AMEX's published data and that of its competitors so the Company could make presentations of its performance versus the performance of its peers. In this regard, CW12 used various comparative "metrics," including from data published for asset-backed securities and information obtained from AMEX's competitors' SEC reports.

154.    CW12 explained that historically AMEX had shown better figures than that of its peers for delinquencies and write-offs, but more recently, in late 2008 and beyond, AMEX's numbers were far worse than its peers. He attributed this primarily to AMEX's aggressive

growth in lending credit in 2006 and 2007.  He pointed out that for some five consecutive

quarters, AMEX was growing at 18+% or more in terms of their new cards and balances, while

the industry was only growing at some 5%.  In terms of quality of the accounts AMEX was

taking on during this aggressive growth period, CW12 stated they had to be "taking share from

revenue," meaning that they were picking up accounts from other credit card providers that

historically would not have been AMEX accounts.

155.    With respect to "FICO" scores that were often discussed on AMEX's conference

calls with analysts, CW10 explained that they "don't turn as quickly" when consumers' finances

deteriorate.  He said when people start to experience significant financial problems, it takes a

little whiel for that to be reflected in the actual FICO scores, so FICO scores aren't always

indicative of current credit risks and weren't indicative of the credit quality of the new accounts

that AMEX was taking on.

156.    CW12 explained that the housing market was a big part of the problem in the

economy and when troubles started to occur in the housing market, declines in value as even

payment issues, were taking some time to develop, so they were not immediately apparent in a

person's FICO scores.  His point was that relying on FICO scores for explaining the credit

quality of new accounts wasn't accurate given the significant economic problems that occurred

in the U.S. in 2007 and 2008.  According to CW12, "FICO scores became irrelevant in 2007."

157.    CW12 stated that AMEX paid close attention to its "Share of Wallet"

measurements.  CW12 explained that Share of Wallet was an internally calculated number that

focused on what consumers were spending and what percentage of that spending AMEX could

capture.  CW12 said that this measurement was calculated by the risk management group and

was the sort of measurement that the Board of Directors reviewed.  CW12 explained that the

decision to increase reserves announced on January 10, 2008 occurred when they observed that December 2007 cardholder spending "fell off a cliff."

158.    With respect to the reporting relationships at AMEX, CW12 stated in the course of his every day work, CW12 explained that he interacted with AMEX's CFO, who was either Gary Crittenden or Dan Henry, and with numerous other high-ranking executives at AMEX. According to CW12, the Company's CFO would have periodic meetings with various business units to review results.  The Company's CFO would also have monthly meetings with the CFOs of AMEX's business units in which the CFO would receive detailed information about the Company's lending book.  CW12 knows this from personal observation.

159.    CW12 further reported that Al Kelly, the head of the Company's U.S. Card division, had in depth knowledge about the Company's lending book, including trends.  As CW12 stated, Kelly was a "data hound."  Kelly would receive this data from the risk management group.  In turn, Kelly would report this data to the Company's CFO.  CW12's knowledge is based on CW12's personal knowledge of the information gathered and prepared by AMEX's finance department and the channels through which this information flowed.

160.    CW12 stated that the risk management group was responsible for calculating loss provisions.  The risk group was also responsible for calculating reserves.  CW12 knows this because, in the course of working on the Company's rolling forecasts for the Company's internal operating plans, he or someone on his team would receive this information from the risk management group.   Some of the calculations were performed by risk management's internal financial unit, which CW12 stated was headed by Tom Toscano, who reported to Ash Gupta. The risk group's financial unit also examined the effects of loss rate forecasts, roll rates and developments in different tranches of customers and products.  The risk group reported decisions

about the Company's loss reserves to Al Kelly, who reported the information to the CFO.   Also based on his experience with the Company's internal reporting systems, CW12 stated that risk management instructed the Company's collections department as to how it should proceed. Collections data was reported upwards to Al Kelly.  CW12 also observed that American Express's various credit and charge card business units reported their delinquency rates and other-related information to AMEX's risk management group.

161.    CW12 observed that in 2006, AMEX put in triggers to automatically extend customers' credit lines.  Customers did not have to approve these extensions and merely received notices that their credit lines had been extended.  CW12 noted that in 2007, it was expected that cardholder loans would grow because the depreciating housing market had limited the ability of people to pay their debts through home equity lines of credit.  Prior to 2007, CW12 explained that many credit card companies saw home equity as a competitor because customers paid off their credit card debt through home equity made possible by rising home values.  Indeed, CW12 called 2007 the "Wild West" in terms of card/customer growth at American Express.

162.    CW12 stated that AMEX's business was very concentrated on the coasts and that the Company had significant exposure to California, which saw large declines in the housing market.  CW12 also stated that AMEX's "owned" loan portfolio was heavily skewed toward small business loans  that were prone to significantly higher levels of delinquency than the Company's consumer loans.  The reason for this was that AMEX was, by far, the biggest player in credit cards for small businesses and the Company did not securitize these loans. Accordingly, they remained on the Company's books.  From personal observation of the Company's internal reporting system, CW12 knows that the fact that the delinquency risk in American Express's owned portfolio was significantly higher than in its managed portfolio

because of the presence of a large number of small business loans in the owned portfolio would have been reported to the Company's CFO in the monthly meeting of the CFOs of American Express's business units. CW12 estimated that approximately 20% of the "owned" loan portfolio were small business loans.

163. CW12 observed that most American Express Blue cards had introductory rates of 0% and therefore did not yield much to the Company in the way of interest revenue. The introductory rate period could be as long as 18 months.

164. To CW12's knowledge, American Express did not publish its delinquency rates by vintage account before August 2008. CW12 has knowledge regarding this issue because the comparative analysis aspect of his job required him to be aware of the types of lending portfolio data made publicly available by AMEX.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

165. Throughout the Class Period, as the economy soured and investors and analysts asked increasingly pointed questions about AMEX's galloping levels of growth in its cardholder charge and lending receivables (or loans), Defendants doggedly (and falsely) insisted that AMEX's credit quality was excellent and had not deteriorated, and that, despite the economy's deterioration, AMEX had controlled its credit risk and properly set its loss reserves. Defendants explained that AMEX's extensive and up-to-the-minute internal cardholder data (which AMEX did not reveal) and sophisticated systems to cut and dice that data, had resulted in superior credit decisions and lower levels of credit losses. To convince investors and analysts (as well as AMEX's rating companies) that AMEX's portfolio and losses were superior, Defendants repeatedly pointed to lagging metrics (such as AMEX's write-off rates and customer FICO scores) and other data that was not representative of AMEX's "own" experience -- such as the

credit performance of its securitizations.  The Class Period begins with Defendants' description

of the quality of its cardholder receivables and loans as of the end of 2006.

<u>Statements About the Portfolio and Risk as of December 31, 2006</u>

166.    On January 22, 2007 at an earnings call with analysts addressing AMEX's 4Q06

results, Gary Crittenden, AMEX's then Executive Vice President and Chief Financial Officer,

stated:

> Domestically as I have said in prior calls, you know, we have developed ***under Ash Gupta's leadership really some very good capability to make judgments about where you can extend credit line wisely and where you can't, looking at the full set of factors about a customer.  How indebted they are on other products.***  The way they pay u s on other products they might have with us.  ***Their total size of wallet compared to the amount of indebtedness that they have to us.*** We have developed a lot of intelligence about how to use that credit line wisely. Expand it rapidly, contract it when we need to contract it -- we have developed a lot of capability in that regard.  And that has really enabled us to fuel very good growth on the lending side to match with our billed business growth and we have now sustained that as you have seen for a while.  Now, I wouldn't want to give you the sense that that is sustainable forever into the future.  We wouldn't make a forecast like that.  But we do feel good about how those products are performing. So you know, Costco continues to perform very well.  Our Blue product is performing well.  You see the impact of Blue  Cash on the contra revenue item that I talked about just a minute ago.  Our small business lending product is doing very well.
>
> And so there is a pretty good list of things that are doing well.  I think an important factor here is that ***we really have not been relying on 0% balance transfer.***  In fact that number for us keeps coming down and that's been one of the contributors to the -- to being able to sustain our yield is that the 0% kind of balance transfer business becomes a smaller and smaller portion of what we do. And so it really is kind of a broad-based improvement in our business based on, I believe, ***a real in depth understanding of what the capacity is of our customers to repay us.***  Obviously it is being ***reflected in the credit performance.  The credit performance has been really outstanding*** and that's driven by our actual results over the last 24 months.

(Emphasis added)

167.    With respect to the Company's loss reserves, Crittenden stated:

While higher loan volumes have also driven greater reserves year-over-year, *reserve coverage of past due accounts fell slightly below 100%, reflecting the improved credit trends within the portfolio over the duration of the model measurement period of 24 months.* The charge card provision decline reflects *a lower loss rate* and improved results within our collection activities in the U.S. partially offset by higher volumes worldwide.

(Emphasis added)

168.    Chenault, in AMEX's February 26, 2007 letter to shareholder associated with the

Company's 2006 annual report, stated:

> Cardmembers of all types -- consumers, small-business owners, midsize companies and large corporate customers -- spent significantly more on American Express cards in 2006. Worldwide billed business, which includes spending on our proprietary products as well as the cards of our network partners, rose 16 percent to a record $561.5 billion. This rate of growth outpaced that of all major issuers.

> Growth in spending came from two sources. First is the expansion of our cardmember base. We added 7 million cards-in-force in 2006, one of our largest annual increases, which brought total cards-in-force to 78 million. Second, we continued to increase average spending per card, which rose 7 percent year-over-year.

> Cardmember spending, which generates discount revenue, is the foundation of our business model. But we also earn interest and fees from lending, or revolving card balances. This source of revenue is an important complement. Cardmember loans have risen along with spending, increasing 17 percent on a managed basis and 31 percent on a GAAP basis in 2006. By contrast, most of the major card issuers experienced growth in the single digits.

> *Even as our cardmember base and lending portfolio grew, our overall credit quality remained well controlled. Write-off rates in both our charge card and lending portfolios improved from a year ago. Provisions for losses rose due to increased loan volumes globally and higher loss rates in some international markets, most notably Taiwan. This was partially offset by lower bankruptcy-related charge-offs and excellent credit quality in the United States.*

> Taken together, our spending and lending growth, the global expansion of our card franchise and *the quality of our lending portfolio underscore the momentum of our payments business.*

(Emphasis added)

169.    These statements, as highlighted, were false and misleading, and omitted information which in the context of the statements made, was necessary to make them not misleading.  As the CW's explained, the detailed information compiled by risk management had not been used to limit credit risk, but rather to drive spending and to knowingly assume greater levels of credit risk.  AMEX's credit performance had not been "outstanding" -- loss provisions that should have been established using current past due cardholder data and trends, were being suppressed and obscured through the use of "write-off rates" that lagged the current environment.  As several CW's reported, the credit quality of the newer vintages of loans were not "excellent" but had deteriorated.  In fact, as the CW's described, AMEX had been widely "relying on 0% balance transfers."

Statements About Second Quarter 2007 ("2Q07") Results

170.    For 2Q07 AMEX reported 33% growth in the Company's lending balances.  At the 2Q07 earnings call with analysts, Henry then AMEX's Executive Vice President and acting Chief Financial Officer, stated in his opening remarks:

> Additionally, ***credit quality continues to be very strong.***  As expected, losses have trended upwards post the US bankruptcy reform benefit last year.  However, ***credit quality remained well controlled during the quarter as we continue to see the positive impact of our historic focus on the premium sector*** and our rewards capabilities ***through top tier write-off and past due levels***.

(Emphasis added)

171.    AMEX's high cardholder lending growth and Henry's comments led analysts to question whether, in fact, AMEX could grow at these levels without taking undue credit risks.  Henry, however, pointed to the Company's credit statistics and insisted that AMEX;'s credit profile remained unchanged:

**Analyst:**
***The one thing though that does continue to raise my eyebrows if you will is the growth in the lending balances and my concerns with that with regards to potential credit risk.*** Frequently when you've seen somebody grow way above the industry and you guys are taking I think the lion's share of the industry – of the growth in the industry right now, you sometimes see credit blip up. If you look at credit on a lagged basis, it's moving up there. It's still not at alarming levels, but it has moved up a little bit more on a lagged basis than I would like to see. So I would just like a little bit more explanation maybe on your point for in party why you think you are able to grow so much about because American Express historically has taken some market share but not at this pace. So what's different and secondarily your comfort; ***why are you so comfortable with credit with that growth?***

**Henry:**
***In terms of credit, you can see from our credit statistics that our credit statistics, while they have moved up from last year because of very low levels last year, we're still very comfortable where our credit metrics are showing. We have not in any way changed the criteria that we set in terms of bringing customers onto our books and so we're not seeing any change in terms of the quality of customers that are in our franchise.*** So overall we're very pleased with both the growth in spending, the growth in A/R balances and, the quality of customers that we have.

(Emphasis added)

172.    Henry's statements, as highlighted, were false and misleading, and omitted information, which in the context of the statements made, were necessary to make them not misleading. As the CW's reported, credit quality had, in fact, deteriorated and approval criteria for the recent vintages of cardholder loans that had fueled AMEX's high levels of cardholder loan growth had been changed. Though Henry pointed analysts to AMEX's credit statistics, it withheld those which would permit an understanding of the current growing risk in the portfolio, such as the 30-60 day delinquency rates (as distinguished from 30+ day data which covered all levels of delinquency) that were early warning signs of growing problems, the Company's "roll rates" or credit data by vintage year.

173.    Henry's misrepresentations temporarily succeeded in hiding AMEX's exposure to high-risk customers, though the market remained concerned.  For example, a July 24, 2007 Merrill Lynch report stated that "[m]ore constructively, AXP continues to generate attractive growth in cards-in-force and average spending, supporting its argument that lending growth is a by-product of acquiring high-spending customers."  However, the same report cautioned that "AXP's fast growing lending business could raise concerns that credit quality is deteriorating."

174.    On August 1, 2007, Kenneth Chenault, American Express's CEO, participated in American Express's Semi-Annual Financial Community Meeting.  At the meeting, Chenault made several misstatements that specifically addressed the credit quality of AMEX's loan portfolio and its relationship with the recent explosion in AMEX's lending business.  For example, Chenault stated that:

> Our growth in receivables also continues to outpace our peers.  Our 21% increase puts us well above the single digit growth rate of most major players…. There are two important points to note about our loan growth.  First, it is being generated from our spend centric model.  ***Our growth is not being driven by balance transfers*** from new, unknown customers.  Instead, our growth is coming largely from the revolve spend of tenured customers.

175.    Chenault continued with a full-court press on the subject, hurling a slew of incomplete data at the market in an attempt to mask the fact that AMEX had exposed itself to significant credit risk by taking on groups of high-risk borrowers:

> ***The second point I'd make about our growth is that it is not coming at the expense of our credit performance***.  Once again, we put very strong credit numbers in the quarter.  ***We're not generating growth by loosening our standards and hunting in the subprime space. And we're not buying balance growth with 0% APR offers. In fact, our managed yield has been very consistent over the last several years***, and the percentage of our portfolio on promotional rates has declined.
>
> We continue to pursue growth in the prime and super-prime lending segments and, as a result, ***we continue to focus our acquisition efforts in the mid to upper tier of prospects. For example, as you can see here, of the new credit cards***

*approved in the US on a year to date basis, 89% have a FICO score greater than 660, a mix that has stayed very consistent with last year. This demonstrates that our year to date growth rate is not being driven by the acquisition of lower quality cardmembers. Instead, we're sticking to our spend-centric strategy and continue to target and acquire very creditworthy customers.*

I should also point out that the FICO scores across our entire portfolio of consumer and small business credit cards are also both high and consistent. As of June, 84% of our balances have scores above 660, a strong number for our industry as you can tell from the reported master trust numbers for our peers.

*Now I should note that these FICO scores are actually an outcome of our acquisition methods rather than an input. Our proprietary credit models have advanced far beyond relying on FICO scores as our only selection criteria. Instead, we consider a range of robust factors before making an offer to a prospect. For example, we consider their total size of wallet. We segment a prospect's needs between their spend and revolve capacities, and we look at their home value. By using a wide range of factors, we believe we're far more knowledgeable about a prospect's true creditworthiness before they even join our franchise.*

*As you can see here, given our focus on the upper end of the market, our US metrics are far better than the industry average, with performance that continues to be among the best in class. As with other US issuers, we did have a negative year over year impact on write-offs; but this variance was largely driven by the prior year, not the current year.*

*Last year's write-offs were abnormally low due to favorable carry-over impact of the 2005 US bankruptcy legislation, while this year we've returned to more normal trend levels. In fact, our current credit performance remains very much in line with historical trends, as you can see here.* Our current write-off rates, whether lagged or coincidental, are below the levels of 2003 and 2004, and about equal to the levels of 2005 before the impact of the bankruptcy law change.

The dramatic decrease in rates in 2006 was the result of people accelerating their bankruptcy filings into 2005 in order to qualify under the old law. As the impact of the bankruptcy law worked through the year, we did see our rates rise. But as you can see, excluding this impact in 2006, *write-offs remain at an historically low level*, a level that for the most part has now normalized for post-legislation bankruptcy trends and for the current economic environment.

*The ongoing investments we're making in our risk capabilities and our focused efforts to bring in higher spending, more creditworthy cardholders, are paying off. Our credit quality continues to be well controlled and I remain quite comfortable with the level of risk within our business.*

(Emphasis added)

176. Chenault's statements were false and misleading, and omitted information, which in the context of the statements made, was necessary to make them not misleading. As the CW's reported, 0% balance transfers to the Blue Card were widely offered and used to entice cardholders to shift their accounts from other credit card issuers. In addition, with respect to that portion of AMEX's growth that did come from existing customers, risk had been heightened because a large number had become over-extended, and cardholders who, in the past could pay off balances in 30 days, could no longer do so. In addition, many of AMEX's cardholders who were concentrated in areas where housing prices had plummeted were turning to AMEX to provide credit because they no longer had equity in their homes -- a metric that Chenault had himself asserted AMEX's risk management group tracked within its "Share of the Wallet" technology.

177. Chenault insisted that AMEX's internal credit data was superior to FICO scores in assessing current credit risk, and it was, but, as the CW's reported, however, the internal "share of wallet" data -- which was not disclosed -- did not support Chenault's claims. Chenault further misled analysts by pointing to comparisons of "write-offs" between AMEX and other credit card issuers, because "write-offs" was lagged data that failed to capture either the changes in the profile of AMEX's recent vintages of loans, or the souring of the housing markets and economy at large. Through his comments regarding write-off trends, Chenault obscured the current heightened delinquencies that correlated to the drop in housing prices. As the various CW's reported, AMEX's credit quality was decidedly not "well controlled," and Chenault's statements were at best half-truths that misled investors about the overall credit problems and growing credit losses.

178.    These direct representations by American Express's CEO had the desired effect of quieting the market's concerns about American Express's lending practices.  For example, a August 2, 2007 Merrill Lynch report concluded that: "Despite the rapid growth of AXP's lending business, credit remains good, as receivables growth is driven mostly by revolver-based spend from tenured cardmembers.  We think AXP could continue to witness superior credit quality, due to its focus on the upper market."

Statements About Third Quarter 2007 ("3Q07") Results

179.    For 3Q07, in AMEX's announcement of earnings and in its Form 10-Q, Defendants understated the Company's loss reserves required under GAAP, and the associated provision expense.  In particular, Defendants **reduced** the loss reserves, particularly as a percentage of the Company's delinquent charge and loan receivables, even though, with the subprime crisis and deterioration of housing prices, and the souring of the economy, AMEX's credit risks had increased and the net realizable values of its cardholder receivables and loans had substantially decreased.  AMEX reported the following statistical information in its 3Q07 Form 10-Q:

(Chart on Following Page)

| (Billions, except percentages and where indicated) | Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | **2007** | | **2006** | |
| Worldwide cardmember receivables: | | | | |
| Total receivables | $ | 38.5 | $ | 35.0 |
| 90 days past due as a % of total | | 2.8% | | 2.8% |
| Loss reserves (millions) | $ | 998 | $ | 947 |
| % of receivables | | 2.6% | | 2.7% |
| % of 90 days past due | | 91% | | 97% |
| Net loss ratio as a % of charge volume | | 0.26% | | 0.26% |
| Worldwide cardmember lending -- owned basis: | | | | |
| Total loans | $ | 50.5 | $ | 38.3 |
| 30 days past due loans as a % of total | | 3.0% | | 2.8% |
| Loss reserves (millions): | | | | |
| Beginning balance | $ | 1,417 | $ | 1,086 |
| Provision | | 543 | | 381 |
| Net write offs | | (499) | | (353) |
| Other | | 8 | | 12 |
| Ending balance | $ | 1469 | $ | 1,126 |
| % of loans | | 2.9% | | 2.9% |
| % of past due | | 97% | | 106% |
| Average loans | $ | 48.8 | $ | 37.5 |
| Net write-off rate | | 4.1% | | 3.8% |
| Net finance revenue(b)/average loans | | 9.3% | | 9.5% |

180.    This shows that Defendants set AMEX's 3Q07 loss reserves for its charge cards at a sharply reduced level of the Company's overall charge receivables and its 90-day plus delinquent accounts.  Had AMEX merely reserved at the same level as it had in the analogous quarter in 2006 when the economy was far stronger, these reserves would have been $65 million higher.  Similarly, Defendants set AMEX's 3Q07 loss reserves for its lending receivables at a lower level of its 30-day plus delinquent accounts.  Had AMEX merely reserved at the same level as it had in 2006, when the economy was far stronger, these reserves would have been $135 million higher.  Thus, had the Company merely set its reserves at the level it had in the analogous 2006 quarter, it would have reported an additional loss provision and expense attributable to its actual delinquencies of $200 million.  As a result, AMEX's 3Q07 loss reserves were clearly understated and its profits overstated for this quarter in material amounts.

181.    At the 3Q07 earnings conference conducted on October 22, 2007, Dan Henry in

his opening statement continued to misrepresent the quality of the Company's portfolio and

credit performance:

> Credit quality continues to compare favorably to the industry. As expected, losses
> and past-due levels within the US have trended higher post the bankruptcy reform
> benefit of last year. ***However, credit quality indicators remain in line with
> historic ranges*** as we continue to benefit from our focus ont eh premium market
> sector and our rewards-oriented strategy. Needless to say, in light of some signs
> of stress within aspects of the environment and our strong receivable growth, we
> continue to be carefully monitoring the trends as we go forward.
>
> *                *                *
>
> ***Despite some of the near-term interest and provision pressures we see, we
> continue to have confidence in the outlook*** of our business, for several reasons.
> Our position within the affluent and high-spending card member sectors remain
> excellent. It is supported by our ability to leverage our direct merchant
> relationships, the unique information benefit of our closed-loop network and our
> attractive rewards program.

(Emphasis added)

182.    In response to questioning about the adequacy of the Company's loss reserves and

cardholder trends, in light of the Company's growing, above-industry levels of receivables,

Henry responded that the reserves were justified by the Company's models and experience and

the behavior of its cardholders.

> **Analyst:**
> Then the follow-up is you guys experienced, again, receivable growth that none of
> your competitors experienced, not to mention the billed business growth. Is your
> provisioning policy that you're just keeping up with the receivable growth?
> That's what you're allowed to do. Can you explain your provision policy?
> Because obviously the market is freaked out sufficiently about some of the bank
> players who have increased their provisions for different reasons.
>
> **Henry:**
> So, as we have discussed, we are focused on acquiring customers that have high
> level of spend. We put products in the marketplace, both charge products and on
> the lending products, and we allow, really, the customer to choose which product
> that they want to use, but focused on customers with high spend. As people spend

on lending products, there is a flow-through effect of that high level of spending, which is driving the increase in our loan balances.

*Now, as it relates to our provisioning, we have used the same model for provisioning for the last several years. It's focused on the experience that we see, and used those models the same way this quarter as we have in past quarters. So we continue to use the same methodology. We think it's a methodology that appropriately matches credit expense with the revenues that are being generated and provides us with reserves that are appropriate, given the behavior that we're seeing within our customers.*

**Analyst:**
What are you seeing in terms of behavioral trends with your high-end consumer?

**Henry:**
*I think you can look at both our average spend numbers*, which, despite the fact that we continue to bring in a substantial number of new cards, continues to be very strong, continues to be well above the competition. *I think that's a reflection of the quality of customers we're bringing in*, as well as the loyalty of those customers, based on the value proposition that we offer to them.

(Emphasis added)

183.    As analysts continued to press Henry about the Company's unusual growth and

the growing credit risk as the economy slowed, Henry continued to insist that the superior

information obtained from AMEX's internal monitoring capabilities reduced its risk:

**Analyst:**
American Express is clearly generating very impressive revenue growth from its lending strategy. *With the credit delinquencies starting to march up as, of course, has been long expected, and with economists in the US calling for a bit of a slowdown, are you guys taking steps now to tighten underwriting standards* and dial back on the growth? Or are you planning to keep growing, so that the denominator keeps the credit loss ratio from getting too high?

**Henry:**
I think it's important to view our results in the context of the industry, which everybody is aware of. *We've been able to balance strong business growth, along with credit indicators which continue to be favorable to the industry.* Certainly, if you look at some of our competitors, while their growth in spending and their portfolios have been significantly slower than ours, some have been able to control credit well and some have not. As we all know, credit risk is inherent in our business.

But our main focus is to ensure that we are making good economic decisions that really maximize the portfolio, as opposed to being focused on simply keeping write-off rates at a low level.  That has always been our outlook and will continue to be our outlook.  As we've discussed numerous times, *we think we have built very strong credit capabilities, and those capabilities will monitor very closely what is taking place within the portfolio.  We will react appropriately to any changes in the credit environment.*

(Emphasis added)

184.    And, as Henry further explained:

So, as we say often, we have a spend-centric focus.  So it is not our objective to build the loan balances.  It's our objective to bring on card members who have higher-than-average spend.  *We allow those customers, really, to pick the product that best suits them.*  So that could be a charge card, it could be a co-branded card, it could be lending on charge, it could be a Blue card.  *As long as, on average, we're bringing in customers that have higher average spend, that really meets our business model of being focused on spend.*

Now, what we're getting is really a flow-through of that higher spending on our lending products, which is what's growing our loan balance.  So we don't have a loan balance growth target; it's really driven by our spend, and we continue to be focused on the behavior of our customers.  *We think we have excellent best-in-class credit capabilities*.  They are very -- at all times are focused on the behaviors of our customers, and given the environment today, are even more so.

(Emphasis added)

185.    Finally, even when Henry was specifically directed to the credit problems identified by AMEX's peers in particular areas of the country where housing price appreciation had reversed, Henry still maintained that AMEX had escaped because of the superior credit quality of its portfolio:

**Analyst:**
*One of your competitors had said that they had seen an uptick in delinquencies in credit issues in areas that have experienced high home price appreciation, like California and Florida*, for example.  Are you not seeing that same kind of thing?

**Henry:**
*So as you can see from our credit metrics*, *they have ticked up slightly, but very much in line with what we expected coming off very low rates last year*.  So, at

the current time, the credit quality of our portfolio continues to be the same. I think we benefit from the fact that we are focused on the prime and superprime areas. ***So we have not directly seen an impact from subprime activity at the current time***.

(Emphasis added)

186.    The statements above with respect to the adequacy of AMEX's 3Q07 loss reserves and provision expense, the consistency of AMEX's provision methodology, the observed recent behavior of AMEX cardholders, the high credit-worthiness of AMEX's customers, the appropriateness of AMEX's response to use of its strong credit monitoring capabilities, and the adamant denial that AMEX was facing higher delinquencies in California and Florida, were all flatly false and misleading. All of these assertions are at odds with the reports of the confidential witnesses, and as Defendants themselves later revealed.

187.    Defendants knew that in its rush to increase the spend rate, AMEX had vastly expanded its lending business at the expense of its traditionally high underwriting standards. For example, as noted by Deutsche Bank on December 11, 2008, American Express had expanded its subprime lending by two-thirds to $7.5 billion, representing 17 percent of the Company's portfolio. This high risk lending dramatically increased the default rates in accounts acquired by AMEX in 2005, 2006 and 2007. Al Kelly admitted this point on August 6, 2008 when he presented a chart showing the American Express's 2005, 2006 and 2007 vintage accounts performed significantly worse than early vintage accounts. Kelly confirmed this point when he admitted that AMEX's out-sized lending growth had caused increased defaults, stating that "higher-than-industry growth in the last three years" drove a 100 basis-point increase in American Express's net write-off rate, which was "among the highest increases in the industry." Kelly's chart showed that AMEX's much higher cardholder defaults were well under way by October 2007.

188.    On August 6, 2008, Al Kelly admitted that by the "***summer of 2007***," American Express knew about the deterioration in the credit quality of its customers and took corrective actions, including integrating "housing information" in its decisions, adjusting "risk models" for small businesses in the mortgage industry and restricting the number of line increases a cardmember could receive in a given period of time.  Indeed, Kelly admitted that even before the summer of 2007, American Express had seen the need to begin canceling "inactive low-FICO accounts."

189.    ***By the fall of 2007***, American Express knew that the deterioration in its loan portfolio required more extreme action and the Company reduced lines for cardmembers who had subprime mortgages and "curtailed cross-sell activities for customers who" were "assessed as having mortgage risk in certain geographies."  As these admissions show, by the summer of 2007 or earlier, AMEX's daily monitoring of credit quality had indicated that its  pursuit of growth at the expense of its lending criteria and the deterioration of the housing market in some of the Company's key geographic markets were fueling an escalating and highly problematic delinquency trend in its lending portfolio.

190.    ***By October 2007***, American Express had seen the 30 day delinquency rate spike significantly in markets having large home price deterioration.  *See,* Exhibits A and B.

191.    As admitted on August 6, 2008, American Express's 30 day delinquency rates coincided with falling housing prices, and were directly affected by changes in home prices.  As Kelly noted, "In areas where home prices dropped more than 10 percent, the delinquency rates rose two to three times higher than the total portfolio."  Notably, Los Angeles prices had already fallen approximately 9 percent by October 2007 and had fallen by approximately 12 percent by November 2007.  Prices fell by approximately 11 percent in San Diego by September 2007.

Prices fell by approximately 10.5 percent in San Francisco by November 2007.  Prices had fallen

by approximately 11 percent in Miami by October 2007 and prices had fallen by approximately

10.5 percent in Tampa by August 2007.  This deterioration directly contradicted Henry's

statements and was a red flag that AMEX's lowered credit ratings and geographic concentrations

were quickly eroding the creditworthiness of AMEX's loan portfolio.   Indeed, as Kelly admitted

on August 6, 2008, AMEX's geographic mix "skewed toward Florida and California" drove its

higher write off rates.  And, as Kelly admitted, housing prices were "just a few of the indicators"

that AMEX tracked.

> The November 13, 2007 Merrill Lynch Conference

192.    By November 13, 2007,  an increasing volume of ominous economic news had re-

stoked analysts' fears about the credit quality of AMEX's credit portfolio.  Against this

backdrop,  Chenault attended the Merrill Lynch Banking & Financial Services Investor

Conference.

193.    At the conference, Chenault redoubled his efforts to convince the market that

AMEX's reckless levels of growth in a souring economy would not prove to be its undoing:

> ***The most common questions I get at these sessions from investors are what lies
> ahead? What happens to the company's performance if things slow down? Are
> you going to be hit harder than other companies? What happens if credit
> conditions weaken? Is your current high loan growth rate going to be an issue?***
>
> *                *                *
>
> We've all seen the headlines. Some of them are factual, some are speculative, all
> are sobering. We know that subprime mortgage defaults have grown, we know
> that investment vehicles holding subprime assets have lost substantial value, and
> we know that housing prices in certain parts of the country have fallen, and that
> the housing industry has slowed.
>
> But the impact this will have on the broader economy, on the consumer, on
> business spending and investment is still uncertain. Will they, too, take a hit and,

if so, how much? *So as you can imagine, we're watching all of the indicators and trends very carefully*. . . .

[I]n considering how an economic slowdown might impact the company today, it's important to understand the dramatic scope of changes that we've implemented over the last six years as well as some of the details . . .

Now, there are *two important points to note about our loan growth.  First, it is being generated from our spend-centric model.*  Our loan balances are an outcome of our spend strategy not our primary objective.  Customers are spending on their Delta, Costco and Blue products, and then choosing to revolve that spend.

*Our charge customers are spending on their Green, Gold, and Platinum products and then, as needed, they are opting to use our Lending on Charge products to pay over time.*

*So in looking at our sources of growth, card numbers within our base for more than six months represent 90% of our US consumer credit card portfolio balances, a trend that has been consistent over the past 24 months.  Also, a large proportion of our lending growth has come from* reward-based lend products such as lending on charge, our co-brands *Blue Cash and our  Blue Portfolio*, the majority of which are tied to rewards.

Now, given their respective links, either a reward incentive, a charge product, or, in many cases, both, *these products come with a better risk profile and better customer behavior.*  So the first point is that our growth is driven by the successful implementation of our spend-centric strategy.  We capitalize on the weaker position of our peers by focusing our investments and executing extremely well.

Our demarcation against the rest of the industry does not represent a change in our objectives nor does it represent a change in strategy. *The second point I'd make about our growth is that it is not coming at the expense of credit performance. While lending and delinquency rates were up slightly in the third quarter, we continue to put up very strong credit numbers.*

Now, *we're not generating growth by loosening our standards and hunting in the subprime space, and we're not buying balanced growth with uneconomic pricing.*  In fact, our manage yield has been very consistent over the last several years, and the percentage of our portfolio on promotional rates has declined.

Now, we continue to pursue growth in the prime and super-prime lending segments and, as a result, we continue to focus our acquisition efforts in the mid to upper tier of prospects.  Here is one example -- *when you look at some of the lending trust data, balances are segmented by FICO scores for the industry. You can see that in comparison to our major peers our receivable base has the*

*least exposure to low FICO customers.* Whether looking at a lending or our charge products, our write-up and launch rates continue to be at or near historical lows.

*Our current write-off rates are below the levels of 2003 and 2004 and are about equal to the level of 2005* before the impact of the bankruptcy law changed. Now, the ongoing investments we're making and our risk capabilities, and *our focused efforts to bring in higher-spending, more credit-worthy cardholders are paying off. Our credit quality continues to be well controlled, and I remain quote comfortable with the level of risk within our business even as we generate substantial growth.*

\*    \*    \*

Finally, the risk profile of card members within our lending portfolio has improved since 2001. Of US lending balances in 2001, 83% were generated by customers with initial FICO scores of 661 or greater. Looking at our portfolio today, that number has risen to 91%. *The Blue Card is one of the important contributors to our current portfolio growth. Now, because of the size and growth of this portfolio, some people assume that a mass market product such as Blue must be of low quality, but that is not the case. If you look at a segmentation of Blue acquisitions, over time, you can see that the largest mix shift has occurred among customers in the super prime segment. Those were FICO scores above 750. Those customers now represent 46% of Blue balances as compared to 12% in 2001. Blue customers have always had the credit quality but, over time, it's gotten even stronger.*

(Emphasis added)

194.    For the same reasons described above, and by the confidential witnesses, Chenault's statements were false and misleading. As CW3 described, Chenault's statements are in many instances half truths, where the critical facts to make the statements not misleading are omitted. By November 2007, the much higher delinquencies resulting from AMEX's foolish excessive growth practices, were readily apparent to Defendants. The "Lending on Charge" growth was a red flag that formerly strong charge holders could no longer afford to pay off their balances in 30 days. The Blue card cardholders *were*, in fact, far less creditworthy. Growth was, in fact, coming at the expense of credit quality -- which was clear when delinquencies were examined by vintage year. The Company was indeed "hunting in the subprime space," as

69

Deutsche Bank reported.  FICO scores and write-off rates were not meaningful indicators of credit-worthiness because they lagged the economic downturn.  Pointing to credit information in the securitization trusts was misleading because the profile of AMEX's "owned" portfolio was much worse -- since it included the less seasoned accounts and the small business accounts with much higher loss rates.

195.    Nonetheless, Chenault's direct misrepresentations assuaged some of the market's fears, as reflected by a November 18, 2007 Citigroup report, which opined that American Express was "Resilient to Coming Credit Storm."

196.    However, the consequences of American Express's expansion into high-risk customers were beginning to catch up with it.  And within two months of Chenault's robust misrepresentations, on January 10, 2008, American Express was forced to admit that it would take a pre-tax charge of approximately $440 million for its higher cardholder losses.

### THE TRUTH BEGINS TO BE REVEALED

197.    The Defendants slowly leaked the relevant truth into the market, and AMEX's stock price declined, in response, causing damages to Plaintiff and the Class.

The January 2008 Revelations

198.    On January 10, 2008, Defendants shocked the market by beginning to reveal the truth about AMEX 's much higher losses, while concealing the full extent of its problems.  In a January 10, 2008 press release, AMEX announced:

AMERICAN EXPRESS SEES WEAKER U.S. ECONOMY
WILL INCREASE RESERVES WITH APPROXIMATELY $440 MILLION
FOURTH QUARTER CHARGE

COMPANY ADOPTS CAUTIOUS OUTLOOK FOR 2008

NEW YORK, January 10, 2008 -- American Express Company (NYSE:AXP) said today that it is seeing signs of a weaker U.S. economy, as Cardmember

spending began to slow and delinquencies and loan write-offs trended upward during December.  Given the credit-related trends, the Company will take a pre-tax charge of approximately  $440 million (approximately $275 million after-tax) for the fourth quarter.  This charge will raise worldwide lending reserves to one hundred percent of past-due loans and increase reserves related to the charge card portfolio.  Additionally, the Company said it is adopting a more cautious view for 2008.

\*      \*      \*

Kenneth I. Chenault, Chairman and Chief Executive Officer of American Express Company, said: "While overall Cardmember spending continued to be relatively strong and we benefited from a focus on the affluent sector of the market, we did see some negative credit trends among U.S. consumers during December, particularly in California, Florida and other parts of the country most affected by the housing downturn.  Increasing our reserves reflects the most recent credit trends and puts us in an appropriately stronger position for 2008, when we expect those trends to translate into increased write-offs."

199.    In a conference call held with analysts the same day, Henry attempted to swat away questions from analysts suspicious that they had been misled and that the Company's higher credit losses had indeed occurred from the Company's recent accelerated growth and its lower credit profile, for recent cardholder loan vintages.  Thus, analysts asked the following questions, to which Henry gave the following misleading responses:

**Analyst:**
If you looked at the increase in losses, I was wondering if you can comment if there is any specific correlation with vintage of loans and if you have seen payment rates decline?

**Henry:**
*If we look at tenures while it's been across all tenures, if you look at the increase within people who are with us between 12 months and 48 months, it's slightly higher, but again it's still across all tenures and that's why we think this is very much driven by the economy, as opposed to something that's unique to American Express.*

\*      \*      \*

71

**Analyst:**
So you talked I think about the fact that billed business growth -- you had a bigger decline in billed business activity for the newer customers, the 12 to 48 month, I guess you said?

**Henry:**
Okay. ***What I was trying to point out is related to delinquencies***, that we have seen delinquencies pick up across all tenures. Okay, all of our customers, both our new customers, customers we've have had for medium-term and long-term. ***It's up across all tenures***. I am simply pointing out that ***within the tenure group which is 12 to 48 months, the rate of increase has been slightly higher***, but it is still across all tenures that we are seeing the increase in delinquencies.

**Analyst:**
And what about zero to 12 months? How do those people look?

**Henry:**
Zero to 12 is pretty new and so you generally - there is a seasoning that takes place in our portfolio and general behavior of virtually all customers over the first 12 months is pretty good.

**Analyst:**
***I'm just curious because obviously there has been a lot of concern for several quarters about the rate of growth of the lending business in '07, and if you can point to the fact that you didn't end up growing because underwriting standards did deteriorate, or you were less selective, that would be helpful. So what you are suggesting is for those newer vintage customers are not, in fact, performing appreciably worse than older customers. Is that correct?***

**Henry:**
***Yes. So I will bring you back to some of the conversation we had at the financial community meeting back in August. And we shared charts that showed using FICO scores as an indicator, that if you look at the mix of people that we brought into the franchise in 2007, it was identical to the mix from a quality perspective, credit quality perspective, that we brought in in '06. But another thing I would say is that when we saw that there was stress in the marketplace related to subprime in the October-November timeframe, we were putting in very specific changes to our credit criteria for people who had subprime mortgages, for certain industries that were in, say, the construction industry. We were also focused on geographics where they had a downturn in housing.***

(Emphasis added)

200.    The market's response to the January 10, 2008 revelations was swift and punishing.  On January 11, 2008, AMEX's stock price dropped 10% on heavy trading of more than 57 million shares.  As compared to the Russell 3000 Financial Index, AMEX's stock price dropped 8.82%.[3]

201.    Analysts reported that they had been caught by surprise by AMEX's revelations, and questioned the Company's credibility in light of earlier statements.  For example, on January 11, 2008, J. P. Morgan reported:

> ***Charge-offs increasing faster than expected.***  Charge-offs were in line with our expectations in 4Q07, but ***management's guidance for 2008 implies a faster ramp-up than we had anticipated.  Management expects charge-offs between 5.1-5.3%***, which is above our expectations for 4.5% ***and implies that reserves could still be too low***, in our opinion.

(Emphasis added)

202.    JPMorgan further reported that, "investors may question the company's credibility, because management has focused attention on the company's 'spend-centric' strategy and the value of the payments network.  These are positive attributes of the AmEx strategy, in our view.  But the reality is that thanks to 20% growth in credit and receivables in recent quarters, revenues have shifted toward the riskier part of its business."

203.    Nonetheless, other comments by analysts demonstrated that the market continued to be misled with respect to the full extent of AMEX's credit problems.  As Bear Stearns reported on January 10, 2008:

---

[3] The Russell 3000 Financial Services Index is a market-capitalization weighted index composed of those companies engaged primarily in providing financial services that are included in the Russell 3000 Index.  The members of the index are weighted based on their market capitalization (the market value of their common stock).  The Russell 3000 is a broad market-capitalization index that includes the returns from the common equity shares and units of the 3000 largest publicly traded companies traded in the U.S. securities market as measured by their market capitalization.  The members of the Russell 3000 Index represent approximately 98% of the entire market value of publicly-traded common equity securities in the United States.  The common stock of AMEX was included in the Russell 3000 Financial Services Index, and its stock price returns have historically been highly correlated with the returns provided by the Russell 3000 Financial Services Index.

Many investors have worried that the company's rapid loan growth over the past several quarters would lead to significantly higher credit losses in the event of an economic downturn.  Certainly higher loan balances will contribute to higher credit losses (*i.e.*, not lending, no losses), and the company is vulnerable to further credit deterioration, but American Express is likely to continue to outperform its competitors in terms of spending growth, and profitability, we believe.  The credit loss rate will rise, ***but we expect the company's lower exposure to consumers with lower FICO scores to provide a benefit***.

***The company indicated that there has not been a significant difference between the credit performance of newer and older accounts.***  Newer accounts should perform slightly worse because over time, the company is likely to "weed out" the riskiest and least desirable customers.  The geographic differences in credit performance that American Express, Capital One and other issuers have reported over the past few months are consistent with the view that home price appreciation provided a credit benefit to many borrowers over the past several years and that without it, credit quality will deteriorate.  What is still unclear is how much weaker the economy will get and how high loss rates will rise.  If American Express' chargeoff rate in 2008 rose to 6% instead of about 5.3%, we estimate that EPS would be reduced by about $0.35 per share.  Even though American Express is vulnerable to credit deterioration, its earnings remain far less sensitive to changes in credit than other companies that generate an even higher portion of earnings from card lending.

*    *    *

***The following table, based on securitization filings compare the FICO score distributions of major card issuers, shows that American Express has a lower percentage of low FICO score customers***.  Still, we believe it is these lower FICO score cardholders that are contributing to the credit deterioration reported in California and Florida as a result o lower home prices.  It is possible that the company will provide some additional information regarding the performance of different segments of its customer base at its investor meeting in early February.

(Emphasis added)

204.    At the January 28, 2008 earnings conference on AMEX's 2007 annual results, Henry further revealed that AMEX's own credit and loss experience was worse than and not comparable to the accounts in the securitization trust:

***I think we saw an increase in write offs, and that's what's leading to the higher write-off rate.  Now, as it relates to the Trust compared to the owned portfolio, the accounts that are in the Trust are more seasoned.  Okay.  Last time we***

74

*added accounts to the Trust was in October of '06, and the accounts we put in at that time have been in the franchise for a little while. So most of the accounts that you have in the Trust have been with us for probably two years plus. So the new accounts that are being added are really on the owned side, and in that you'll see the normal seasoning that takes place there that you're not seeing in the Trust. And that's why I think you're probably seeing not the same level of change in write offs in the Trust that you're seeing in the owned portfolio.*

(Emphasis added)

205.    Nonetheless Henry continued to mislead when asked whether the newly added

loans were lower quality, directing the analyst to a comparison of relative FICO scores to prove

his point:

> **Analyst:**
> Okay, would that suggest, though, Dan, that the accounts originated over the last couple of years when you had the accelerated loan growth are in fact performing worse, because in the last call you said that they were performing like the others?
>
> **Henry:**
> *Well, I think if you look at the, using FICO scores as an indicator, the accounts that we are acquiring in 2007 have the same quality make up as the accounts that we acquired in 2006. So we haven't changed our criteria in terms of the customers that we bring in from a credit worthiness perspective, but and what I said last time is that we saw a deterioration really across all categories although we saw it a little bit more in those categories where people were kind of going through the normal seasoning process.* Okay?

(Emphasis added)

206.    On January 28, 2008, Defendants also revealed that AMEX's lending had grown

by 22 percent year over year. As a January 28, 2008 J.P. Morgan analyst report put it, "the one

line that caught our attention: credit card receivables continued to grow rapidly (up 22% y/y),

whereas we had been expecting slower growth, assuming the company would be tightening

standards."

207.    On February 28, 2008, American Express filed its 2007 SEC Form 10-K, which

stated:

Since late 1994, our lending balance growth has been among the top tier of card issuers. Much of this growth has been due to the breadth of our lending products, such as the American Express One® Card, Blue from American Express®, Blue Cash® from American Express and the Delta SkyMiles® Credit Card from American Express, as well as the increased number of charge Cardmembers who have taken advantage of our "lending on charge" options (such as the Sign & Travel® and Extended Payment Option programs described above) . . .

*We apply standards and criteria for creditworthiness to each Cardmember through a variety of means both at the time of initial solicitation or application and on an ongoing basis* during the Card relationship. *We use sophisticated credit models and techniques in our risk management operations and believe that our strong risk management capabilities provide us with a competitive advantage*.

(Emphasis added)

208.    At a February 6, 2008 Financial Community Meeting, Chenault revealed:

*Cardmembers in metropolitan areas such as Miami, Tampa and Las Vegas are slowing and stopping payment to us at a much higher rate than customers in other parts of the country.  As a result, our credit metrics in these areas have declined significantly.*

Stepping back a level *you can see that the sharpest increases in our 30+ past due rates over the fourth quarter came from cardmembers in geographies with the greatest decline in home prices.*  Cardmembers in geographies with modest or no decline in value also increased, but at a much slower pace.

Another trend we see is the high correlation between our customers' credit performance and their housing situation.

The highest uptick in 30+ past due rates is for cardmembers who have acquired a mortgage over the last 4 years.

(Emphasis added)

209.    This, however, was information AMEX knew for several quarters.  Chenault, also, continued to deny (falsely) that the Company had loosened its credit criteria for its recent loan vintages:

*One question we've been asked over the last few months is whether our high growth in balances over the last several years is the cause of our current credit*

*issues. Did we loosen standards to add these balances? Are newer tranches of cardmembers performing worse than expected?*

*The answer to both these questions in "No". The entire credit environment has taken a turn for the sores and the entire industry is feeling the impact.*

We've clearly expanded our lending base over the last four years, so purely from a volume point of view we have taken on more risk. But I believe it's been appropriate risk.

\*      \*      \*

If our recent lending growth was of lower quality, you'd also expect to see this in our tenure data, but you don't. As I mentioned earlier, all portfolios mature over time. New customers and highly tenured customers generally have lower losses, while those with tenures of 13 to 36 months tend to be higher.

*As you can see here, growth in our delinquency rate is not being driven by our newest cardmembers*. All segments have weakened, with the mid-tenure segment increasing the most, as we would expect.

(Emphasis added)

210.    As described by the CW's, and as explained above, these statements were false and misleading. At the February 6, 2008 meeting Chenault did not reveal the Company's delinquencies by vintage year. When, four months later, on August 6, 2008 Kelly finally did so, it confirmed that, in fact, the recent vintages of loans were responsible for the lion's share of the growth in credit losses.

211.    For first quarter 2008, AMEX resumed its practice of under-reserving credit losses.

212.    And, on June 9, 2008, Chenault continued to beat the drum that AMEX's write-off rates were lower than its peers because of the superior credit profile of the Company's receivables and loans and its superior risk management:

Since credit is top-of-mind for everyone here I thought what I'd do is drill down a little deeper into some aspects of our performance. So let me start with our relative rates. ***Now there are three reasons for our generally lower write-off***

*rates versus the industry. First, is our premium Cardmember base. Unlike our lend-centric competitors we have never been on the treadmill of having to add balances at all costs.* We look for prospects largely from the Super-prime and Prime segments, who have the capacity to generate profitable spend.

*Now our second advantage is risk management.* And whether it's approving an application or authorizing a higher line of credit, our process is disciplined and our capabilities are advanced. Our models and expert systems employ a wide range of data, data that is specific to a geographic area such as real estate values and also data that is specific to Cardmembers and prospects such as the terms and issuer of their mortgage obligation.

(Emphasis added)

213.    These statements were false and misleading for the reasons described above.

214.    In the June 2008 meeting, Chenault disclosed that small business loans had higher loss rates, and "represented 17% of our total managed portfolio." What he failed to reveal, however, is how significant these higher loss loans were to AMEX's "owned" portfolio -- since small business loans were not contained in the Trusts or securitizations. Chenault also conceded that FICO scores were not a strong indicator of credit-worthiness, conceding that "FICO scores have crept up over time." Nonetheless, Chenault continued to insist that AMEX had ***not*** "outperformed the growth of our lending peers over the last several years" by "lowering our underwriting standards to add balances."

215.    So the market was again caught off guard when, three weeks later, on June 25, 2008, AMEX disclosed that "Business conditions continue to weaken in the United States and so far this month we have seen credit indicators deteriorate beyond our expectations." Although AMEX coupled this disclosure with its announcement of a $1.8 billion settlement of its anti-trust claims against MasterCard, the market was quick to notice the implications of this new revelation of further weakness in the Company's credit portfolio and, in response, on June 26, 2008, AMEX's stock price dropped 5%, 2% against the Russell 3000 Financial Index.

216.    On July 21, 2008 AMEX announced disappointing second quarter 2008 ("2Q08") earnings.  AMEX withdrew its forecast of 4-6% earnings growth, and announced that it was adding $600 million to credit reserves (with a correspondent charge to earnings) for higher write-offs, and was recognizing a $136 million change to reduce securitization income for higher credit losses.  At the July 21, 2008 earnings conference attended by Chenault and Henry, Henry stated that, "we saw credit deteriorate in June beyond our expectations, as the write-off rates rose and roll rates within the portfolio deteriorated versus prior months."  Henry explained that "Roll rates are the amount that move from either current to 30 or 30 to 60, and when roll rates increase, it is an indicator of what is going to take place in the future and why we're anticipating higher write-offs in the balance of the year."  The chart disclosed at this meeting, Exhibit B, showed that, in fact, recent vintages of cardholder loans were responsible for the higher rate of credit losses.

217.    Analysts noted the significance of the trends disclosed by the chart, which Henry attempted to deny:

> **Analyst:**
> Okay, and if I can just ask a follow-up on Slide 20, the -- I mean, do you have any commentary on the slope of the recent vintages and how much that differential versus some of the older vintages relates to this seasoning issue versus changing in underwriting?

> **Henry:**
> Yeah, I mean that's clearly a key question, and I think the reason that we included these multiple years is that from the very early origination years of '01 and '02, you can see the normal seasoning take place, but as you can see, it's having an impact on the '03, '04, '05 vintages, which are very strong vintages, *so it causes us to conclude that the impact that we're seeing in '07 and '06 is being driven by the economy as opposed to that that group was less creditworthy than the groups in the earlier years.*

> **Analyst:**
> Okay.  I guess, Dan, *I'm having difficulty reconciling that though with the severity of the slope on the '06 and '07*.  It would seem to suggest that they're following the same pattern but seem to be more fully-loaded curves.

**Henry:**
Well, I think the folks in the 12 to 36-month are probably the most vulnerable group, because they're in the height of the curve, and so to think that the height of the curve is where you're going to have the greatest impact, to me, is a very logical assumption to make.  But I think you're seeing some of the other curves move up by 100 basis points or more on each plot point, and I think you have to look at all the data that we have available.  ***If you look at Slide 21, here clearly you can see that using FICO scores as an indicator that we not only didn't drop FICO scores, but we actually increased the quality of customers just looking at FICO scores***.  So I think the plot points you're seeing for '06 is reflecting the fact that they are in the height of the curve, and therefore they're being more impacted, but we still think there'll be a large group of customers within that origination year will be terrific customers long-term.

(Emphasis added)

218.    With these partial disclosures of the truth, AMEX's stock price declined more than 13% over a three-day period in heavy trading.  As against the Russell 3000 Financial Index, AMEX's stock declined more than 10% over this same period.

219.    On August 6, 2008 at a Financial Community Meeting Al Kelly disclosed key facts about AMEX's weaker credit portfolio and credit losses.  These included:

- That AMEX's 2005, 2006 and 2007 vintages account were performing much worse in terms of write-offs than accounts underwritten at other times.

- That American Express's credit metrics deteriorated in the second half of 2007.

- That the deterioration in credit was heavily skewed geographically, with concentrations in California and Florida.

- That AMEX had integrated housing and mortgage information into its models in the summer of 2006 and begun using that information in 2007.

- That AMEX's higher than industry growth rate in the preceding three years, driven by the levels of new cards acquired and line increases, had contributed to the acceleration in AMEX's write-off rates.

- That AMEX's high proportion of small business accounts contributed to the acceleration in AMEX's write-off rates.

- That AMEX's concentration in California and Florida had contributed to the acceleration in AMEX's write-off rates.

- That AMEX had "increased credit risk" by targeting small business and cobrand cards where the average acquisition cost per card was lower.

220.    One day later, on August 7, 2008, as a result of the partial disclosures of the truth, AMEX's stock price declined 4%, and 2.4% as against the Russell 3000 Financial Index.

221.    On September 26, 2008 Credit Suisse published a report analyzing the 2Q08 data released by AMEX and information derived from its Securitization Trust.  It reported:

Higher Receivables Growth

American Express' US card lending portfolio grew 17% and 23% over the last two years, 11 and 14 percentage points faster than the industry (Exhibit 2).  *As we have written in the past, this higher level of growth relative to the industry is a significant contributor to the magnitude of the credit deterioration seen at American Express over the last several months.*

While the deterioration in credit has been seen across all major credit card issuers, *the increase in AXP's loss rate during the second quarter was nearly twice that of Citibank North America, Discover, and JP Morgan's US Card divisions (Exhibit 4). Year-over-year American Express has experienced the largest rise in credit losses* with 280 bps, followed by Capital One with 270 bps, and Citi North America with 200 bps.  Over the past two quarters, Amex's loss rate is up 220 bps compared to 150 for the peer group.

(Emphasis added)

222.    Credit Suisse further concluded:

We estimate that the 2006 and 2007 vintages represent approximately 30-35% of the US lending portfolio.  *The 2006 vintage is performing at least 400 bps worse than prior-year vintages.  Based on 2007's current trajectory, the net loss could easily reach or exceed 10% over the next 12 months, 500 bps worse than earlier years.*

(Emphasis added)

223.    With this partial disclosure of the relevant truth, on September 29, 2008, AMEX's stock price declined more than 17%, and declined more than 9.5% as against the Russell 3000 Financial Index.

224.    On November 11, 2008, American Express announced that the Federal Reserve had approved its application to become licensed as a bank holding company.  On November 12, 2008 the Wall Street Journal reported that AMEX had requested $3.5 billion of taxpayer-funded capital.  With these announcements the full extent of AMEX's critical credit problems, and the disastrous results of its policies, were laid bare.  As a result, on November 11, 2008, AMEX's stock price declined about 6.5% and 4.5% against the Russell 3000 Financial Index; and on November 12, 2008, AMEX's stock price declined about 10.5% and 5.5% against the Russell 3000 Financial Index.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

225.    At all relevant times, the market for AMEX's securities was an efficient market for the following reasons, among others:

(a)    AMEX's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, AMEX filed periodic public reports with the SEC and the NYSE;

(c)    AMEX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    AMEX was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

226. As a result of the foregoing, the market for AMEX's securities promptly digested current information regarding AMEX from all publicly-available sources and reflected such information in AMEX's stock price. Under these circumstances, all purchasers of AMEX's securities during the Class Period suffered similar injury through their purchase of AMEX's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

227. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

228. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AMEX who knew that those statements were false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule l0b-5**
**Promulgated There Under Against All Defendants**

229.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

230.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) caused Plaintiff and other members of the Class to purchase AMEX's securities at artificially inflated prices, and when the truth was revealed, to suffer losses on their securities as the artificial inflation in the stock was removed. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

231.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of a material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for AMEX's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

232.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AMEX's financial condition, performance, business relationships, and prospects, as specified herein.

233.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AMEX's value and

performance, and expectations of continued substantial growth, which included the making of, or

the participation in the making of, false and/or misleading statements of material facts and

omitting to state material facts necessary in order to make the statements made about AMEX and

its business operations and future prospects in light of the circumstances under which they were

made, not misleading, as set forth more particularly herein, and engaged in transactions,

practices and a course of business which operated as a fraud and deceit upon the purchasers of

AMEX's securities during the Class Period.

234.    Each of the Individual Defendants' primary liability, and controlling person

liability, arises from the following facts: (i) the Individual Defendants were high-level executives

and/or directors of AMEX, during the Class Period and members of the Company's management

team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and

activities as a senior officer and/or director was privy to and participated in the creation,

development and reporting of the Company's financial condition and earnings, plans,

projections, and/or other reports including but not limited to with respect to the Company's

losses, reserves, credit trends, underwriting policies and practices and liquidity (iii) each of these

Defendants enjoyed significant personal contact and familiarity with the other Defendants and

was advised of, and had access to, other members of the Company's management team, internal

reports and other data and information about AMEX's underwriting policies and practices, credit

trends, finances and operations, at all relevant times; and (iv) each of these Defendants was

aware of and/or personally disseminated or failed to correct information to the investing public,

and to analysts following and reporting on AMEX's stock, which they knew or recklessly

disregarded was materially false and misleading.

235.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing AMEX's financial condition, performance, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements about the Company's financial condition and performance, including with respect to their underwriting policies and practices, losses, trends, liquidity and their business relationships, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

236.    As a result of the dissemination of the materially false and misleading information and failure to disclose and correct material facts, as set forth above, the market price of AMEX's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of AMEX's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired AMEX's securities during the Class Period at artificially high prices and were damaged when the truth was revealed and the artificial inflation in the price was removed.

237.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that AMEX was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their AMEX securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

238.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder.

239.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

240.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

241.    The Individual Defendants acted as controlling persons of AMEX or its officers within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's  operations and/or intimate knowledge of the false reports filed by the Company with the SEC and disseminated to the investing public, and/or their participation in analyst conference calls and meetings, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the

Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be false or misleading prior to, and/or shortly after these statements were issued, and/or participated in conference calls and/or meetings with analysts in which the statements alleged to be false and/or misleading were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected, as described herein.

242.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions or statements giving rise to the securities violations as alleged herein, and exercised the same.

243.    As set forth above, AMEX and the Individual Defendants each violated Section 10(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other  Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  October 13, 2009                    Respectfully submitted,

SCOTT + SCOTT LLP

BETH A. KASWAN (BK 0264)
THOMAS LAUGHLIN (TL 8888)
29 West 57th Street
New York, NY  10019
Tel: 212/223-6444
Fax: 212/223-6334
Email: bkaswan@scott-scott.com
          tlaughlin@scott-scott.com

*Lead Plaintiffs' Counsel*