```
                                              ┌─────────────────────────────┐
                                              │ USDC SDNY                   │
                                              │ DOCUMENT                    │
UNITED STATES DISTRICT COURT                  │ ELECTRONICALLY FILED        │
SOUTHERN DISTRICT OF NEW YORK                 │ DOC #:                      │
- - - - - - - - - - - - - - - - - - - - - -X  │ DATE FILED:  7/19/10        │
                                      :       └─────────────────────────────┘
LOCAL NO. 38 INTERNATIONAL                    09 Civ. 3016 (WHP)
BROTHERHOOD OF ELECTRICAL             :
WORKERS PENSION FUND, on behalf               MEMORANDUM & ORDER
of itself and all others similarly situated,  :
                                      :
          Plaintiff,                  :

          -against-                   :

AMERICAN EXPRESS COMPANY, et al.,     :

          Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - -X
```

WILLIAM H. PAULEY III, District Judge:

        Lead Plaintiff Local No. 38 International Brotherhood of Electrical Workers

Pension Fund (the "Pension Fund" or "Plaintiff") brings this putative class action against

Defendants American Express Company ("AMEX" or the "Company") and two of its officers,

Kenneth Chenault ("Chenault") and Daniel Henry ("Henry") (collectively, the "Individual

Defendants"). Plaintiff alleges that Defendants violated Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") by misleading investors about AMEX's

underwriting guidelines and its exposure to delinquent cardholder payments. Defendants move

to dismiss the Consolidated Class Action Complaint (the "Complaint") pursuant to Federal Rules

of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion to dismiss the

Complaint is granted.

        While securities fraud claims must be pled with particularity, a plaintiff need not

lard a pleading with streams of consciousness from confidential witnesses and block quotes from

analyst calls. Plaintiff's hydra-like complaint sprawls over 243 paragraphs, some silted with more than 500 words. For purposes of this motion, this Court accepts the factual allegations in the Complaint as true and has endeavored to summarize them. However, that task was a challenge. Where distillation eluded this Court, the unfiltered allegations are excerpted. If this sounds like an apologia for the following summary, it is.

BACKGROUND

I.    The Parties

The Pension Fund purports to represent a class of all purchasers of AMEX common stock between January 22, 2007 and November 12, 2008 (the "Class Period"). (Compl. ¶¶ 1, 14.)

AMEX is a global provider of general purpose cards and travel-related services. (Compl. ¶ 11.) Chenault is AMEX's Chairman and Chief Executive Officer. (Compl. ¶ 12.) Since October 2007, Henry has served as AMEX's Executive Vice President and Chief Financial Officer. Prior to that time, he was AMEX's acting Chief Financial Officer. (Compl. ¶ 13.)

II.    AMEX's Lending Business

a.    Types of Cards

AMEX offers two types of general purpose cards: charge cards and credit cards. (Compl. ¶ 24.) Charge cards provide an alternative to payment in cash and require cardholders to repay the full amount charged each month. (Compl. ¶¶ 25-26.) In contrast, credit cards provide financing and allow cardholders to repay only a portion of their total charges each

- 2 -

month. (Compl. ¶ 26.) AMEX also offers a "lending on charge" program (formerly known as the "sign and travel" program) for charge card holders who have difficulty paying their balances in full. Under this program, customers can repay charges over time but at interest rates higher than AMEX's credit card holders. (Compl. ¶¶ 28-29.)

Beginning in 2004, AMEX began to expand its credit card business and "lending on charge" program. (Compl. ¶ 33.) By 2005, it offered more than 100 different credit cards. (Compl. ¶ 33.) The Blue Card was one of the most popular. (Compl. ¶ 39.) Between 2004 and 2007, AMEX's credit card business grew faster than its competitors. During those years, total loans to AMEX's U.S. cardholders soared from $19.6 billion to $43.3 billion.[1] (Compl. ¶¶ 35-40 (citing charts published after the Class Period)).

By June 2007, AMEX's Blue Card and "lending on charge" program represented 54% of the Company's U.S. loan portfolio. (Compl. ¶ 42.) The Complaint references a December 11, 2008 Deutsche Bank report which noted that AMEX had expanded "its subprime lending by two-thirds to $7.5 billion, representing 17% of the Company's portfolio." (Compl. ¶ 187.) However, the Complaint does not specify the time period covered by that report.

    b.  <u>AMEX's Risk Management System</u>

AMEX monitored the risk associated with its lending business through an internal risk management group ("Risk Management"). (Compl. ¶ 49.) AMEX's various business groups reported "raw observed credit trends" to a financial group within Risk Management. That financial group analyzed the trends and "came to conclusions regarding loss rate forecasts,

---

[1] AMEX published the results from its credit card and lending on charge businesses on both a "managed" and "owned" basis. The "owned" loan portfolio excluded from the Company's balance sheets "all securitized cardmember and related income effects." (Compl. at 12 n.1.)

roll rates, and developments in specific tranches of customers or products." (Compl. ¶ 49.) The head of the financial group reported this information to Ash Gupta ("Gupta"), AMEX's Chief Risk Officer. (Compl. ¶ 49.) In turn, Gupta reported the information to Al Kelly ("Kelly"), the head of U.S. Card Services. Then, Kelly reported the information to AMEX's Chief Financial Officer. (Compl. ¶ 49.) Gupta also worked closely with an "Operating Committee" comprised of AMEX senior executives to ensure that the Company's risk management objectives were implemented. (Compl. ¶ 50.) Thus, according to the Complaint, AMEX's "internal risk reporting system created a direct channel for risk information to reach Chenault and Henry." (Compl. ¶ 50.)

AMEX touted the competitive advantages of its credit risk management system in public filings and analyst calls. Chenault characterized AMEX's credit risk management as a "share of wallet" system that relied not just on FICO scores, but also on cardholders' payment histories, purchase data, 30-day delinquency rates, income, home values, property ownership records, mortgage information, bankruptcies, other debt, and employment status. (Compl. ¶¶ 51-52, 55, 71, 82-85.) AMEX compiled delinquency data by "vintage year"—the year the account was opened—so it "could see developing trends in payments and delinquencies for receivables and loans created at different points in the economic cycle . . . ." (Compl. ¶ 72.) Armed with this information, AMEX analyzed "literally billions of up-to-the-minute purchasing and payment data which was compiled into statistical reports." (Compl. ¶ 71.)

Credit card companies are required to set loss reserves to reflect impairments in the collectibility of cardholder loans pursuant to Generally Accepted Accounting Principles ("GAAP"). (Compl. ¶ 69.) AMEX calculated the amount of loss reserves based in part on a

metric called the write-off rate—the rate at which delinquent accounts are deemed uncollectible. (Compl. ¶¶ 70, 73.) Delinquent balances for charge cards were written off 360 days after they became past due, and delinquent balances for credit cards were written off after 180 days. (Compl. ¶ 70.) AMEX disclosed this information in its 10-K filings. (Compl. ¶ 70.) In the third quarter of 2007, AMEX reduced its loss reserves for charge card and credit card accounts. (Compl. ¶¶ 74-75.)

III.     The False & Misleading Statements

                While the Complaint regurgitates lengthy passages from transcripts of analyst calls, Plaintiff concedes that "the principal statements alleged to be false and misleading . . . are the oral representations made in the second half of 2007 by Chenault and Henry in earnings conference calls and in meetings with analysts and sophisticated investors." (Mem. of Law in Opp'n to Mot. to Dismiss Filed By Am. Express Co., Kenneth Chenault and Daniel Henry ("Pls.' Opp'n Br.") at 25-26.) Accordingly, this Court focuses its analysis on the "principal statements" identified by Plaintiff. Nevertheless, for the sake of completeness, this Court also addresses other alleged false statements.

        a.  2006 Year-End Financial Results

                Plaintiff alleges that as the economy deteriorated, Defendants made a series of false or misleading statements about AMEX's underwriting guidelines, the credit quality of the Company's portfolio, and the level of loss reserves. During a January 22, 2007 earnings call regarding AMEX's 2006 fourth quarter financial results, Gary Crittenden ("Crittenden"), AMEX's then-Executive Vice President and Chief Financial Officer, stated:

> I think an important factor here is that we really have not been relying on 0% balance transfer. . . . The credit performance has been really outstanding and that's driven by our actual results over the last 24 months.
>
> . . .
>
> While higher loan volumes have also driven greater reserves year-over-year, reserve coverage of past due accounts fell slightly below 100%, reflecting the improved credit trends within the portfolio over the duration of the model measurement period of 24 months. The charge card provision decline reflects a lower loss rate and improved results within our collection activities in the U.S.

(Compl. ¶¶ 166-67.)

> One month later, in a letter to shareholders, Chenault stated:
>
> Even as our cardmember base and lending portfolio grew, our overall credit quality remained well controlled. Write-off rates in both our charge card and lending portfolios improved from a year ago.

(Compl. ¶ 168.)

Plaintiff alleges that these statements were false and misleading because, according to certain confidential witnesses (the "CWs"), AMEX had been relying on "0% balance transfers." In addition, Plaintiff alleges that AMEX's recent credit performance had not been "outstanding" because "loss provisions that should have been established using current past due cardholder data and trends, were being suppressed and obscured through the use of 'write-off rates' that lagged the current environment." (Compl. ¶ 169.)

> b.  2007 Second Quarter Financial Results

During a second quarter earnings call in 2007, Henry stated that "credit quality continues to be very strong . . . [and] remained well controlled during the quarter as we continue to see the positive impact of our historic focus on the premium sector . . . through top tier write-

off and past due levels." (Compl. ¶ 170.) In response to an analyst's question whether AMEX

could continue aggressive growth in lending without sacrificing credit quality, Henry asserted:

> [Y]ou can see . . . that our credit statistics, while they have moved
> up from last year because of very low levels last year, we're still
> very comfortable where our credit metrics are showing. We have
> not in any way changed the criteria that we set in terms of bringing
> customers onto our books and so we're not seeing any change in
> terms of the quality of customers that are in our franchise.

(Compl. ¶ 171.) Plaintiff alleges that Henry's statements were false and misleading because

credit quality had deteriorated and approval criteria had changed. (Compl. ¶ 172.) Plaintiff also

alleges that Henry misled analysts by pointing them to credit statistics but withholding 30- and

60-day delinquency rates that would have revealed growing problems. (Compl. ¶ 172.)

On August 1, 2007, during a semi-annual financial conference, Chenault made the

following statements:

> Our growth is not being driven by balance transfers from new,
> unknown customers. Instead, our growth is coming largely from
> the [revolving spending] of tenured customers.
>
> . . .
>
> The second point I'd make about our growth is that it is not
> coming at the expense of our credit performance. . . . We're not
> generating growth by loosening our standards and hunting in the
> subprime space. And we're not buying balance growth with 0%
> APR offers.
>
> . . .
>
> [W]e continue to focus our acquisition efforts in the mid to upper
> tier of prospects. . . . [O]f the new credit cards approved in the US
> on a year to date basis, 89% have a FICO score greater than 660, a
> mix that has stayed very consistent with last year. This
> demonstrates that our year to date growth rate is not being driven
> by the acquisition of lower quality cardmembers. Instead, we're
> sticking to our spend-centric strategy and continue to target and

acquire very creditworthy customers.

. . .

[O]ur current credit performance remains very much in line with historical trends, as you can see here.

(Compl. ¶¶ 174-75.)

Plaintiff alleges that Chenault's statements were misleading because AMEX was using 0% balance transfers to entice potential customers. (Compl. ¶ 176.)  In addition, Chenault misled investors about growth from existing customers because AMEX knew that many of them (i) were no longer paying off balances in 30 days, and (ii) "were concentrated in areas where housing prices had plummeted [and were] turning to AMEX to provide credit because they no longer had equity in their homes." (Compl. ¶ 176.)  Finally, Chenault's comparison of AMEX's write-offs with those of its competitors was misleading because AMEX's write-offs were "lagged data that failed to capture either the changes in the profile of AMEX's recent vintages of loans, or the souring of the housing markets and economy at large." (Compl. ¶ 177.)

    c.  2007 Third Quarter Financial Results

During an October 22, 2007 third quarter earnings conference call, Henry stated:

Credit quality continues to compare favorably to the industry. As expected, losses and past-due levels within the US have trended higher post the bankruptcy reform benefit of last year.  However, credit quality indicators remain in line with historic ranges as we continue to benefit from our focus on the premium market.

(Compl. ¶ 181.)  Responding to an analyst's concern about AMEX's loss reserve policy, Henry stated that AMEX was using the same loss reserve model employed in prior years. (Compl. ¶ 182.)  With respect to cardholder delinquencies in collapsing housing markets, Henry stated, "I think we benefit from the fact that we are focused on the prime and superprime areas.  So we

have not directly seen an impact from subprime activity at the current time." (Compl. ¶ 185.)
Plaintiff alleges that these statements were misleading because AMEX was aware of escalating
credit problems among cardholders. (Compl. ¶¶ 186-191.)

At a November 13, 2007 financial conference, Chenault stated that "[w]hile
lending and delinquency rates were up slightly in the third quarter, we continue to put up very
strong credit numbers." (Compl. ¶ 193.) Chenault also maintained that AMEX was "not
generating growth by loosening our standards and hunting in the subprime space," and "credit
quality continues to be well controlled, and I remain quote [sic] comfortable with the level of
risk within our business even as we generate substantial growth." (Compl. ¶ 193.) The
Complaint alleges these statements were fraudulent because it was "readily apparent" that
AMEX "was hunting in subprime space," and because Defendants pointed analysts misleadingly
to FICO scores and write-off rates. (Compl. ¶ 194.)

Between January 10 and November 12, 2008, AMEX's share price declined
precipitously on seven occasions. Each time, Defendants allegedly continued to mislead analysts
regarding the cause of the Company's problems. First, on January 10, AMEX announced a
charge of $440 million and an increase in its loss reserves due to slowed customer spending and
escalating delinquencies and write-offs. (Compl. ¶ 198.) That announcement triggered an 8%
decline in the Company's stock price the following day. (Compl. ¶ 200.) Second, on June 25,
AMEX announced that "[b]usiness conditions continue to weaken" and "credit indicators
deteriorate[d] beyond . . . expectations," causing a 5% decline in the stock price the following
day. (Compl. ¶ 215.) Third, on July 21, AMEX announced disappointing earnings and an
additional $600 million charge to increase its loss reserves. In the three trading days following

- 9 -

that announcement, AMEX's share price dropped 13%. (Compl. ¶¶ 198, 216.) Then, at a

financial conference on August 6, AMEX presented information regarding problems with its

credit portfolio and the causes of its credit losses, which included a chart revealing write-off rates

for 2006 and 2007 that were higher than prior years. (Compl. ¶ 219.) When that mix of

information was absorbed by the market, AMEX's share price dropped 4%. Fifth, on September

26, Credit Suisse published a report cataloging additional problems with AMEX's portfolio.

After that report became public, AMEX's share price plummeted 17%. (Compl. ¶¶ 221-22.)

Finally, two related events in November led to another 17% decline in AMEX's share price—the

November 11 announcement that the Federal Reserve Bank approved AMEX's application to

become a licensed bank holding company, and the November 12 Wall Street Journal report that

AMEX had requested $3.5 billion of taxpayer funds. (Compl. ¶ 224.)


IV.    The Confidential Witnesses

              To buttress its fraud allegations, Plaintiff relies largely on information supplied by

twelve CWs. That confidential witness information spans sixty-four seemingly unedited

paragraphs of the Complaint.

              CW1 was a credit analyst whose responsibilities included approving new

accounts, increasing lines of credit, and transferring balances from non-AMEX cards. (Compl. ¶

100.) In 2006 and 2007, she approved cardholders with FICO scores in the low 600s and at

times with scores as low as 550. (Compl. ¶ 102.) She also executed numerous balance transfers

to the Blue Card because of its popular 0% balance transfer rate. (Compl. ¶ 103.)

              CW2, CW7, CW8 and CW10 were customer service representatives or managers.

- 10 -

(Compl. ¶¶ 105, 134, 141, 147.)  Three of them worked in AMEX's Fort Lauderdale customer

service center, and the fourth was employed by an independent contractor which provided

customer service to the Company's cardholders.  (Compl. ¶¶ 105, 134, 141, 147.)  These CWs

asserted that AMEX incentivized its customer service representatives to approve new

applications by, inter alia, automatically prompting them to offer the "sign and travel" option to

customers, (Compl. ¶ 106); giving bonuses for successful sign-ups, (Compl. ¶ 136); and

increasing bonuses from $9 in 2005 and 2006 to $25 in 2007 and 2008, (Compl. ¶¶ 136, 138).

They also described a regime under which AMEX offered too many cards, (Compl. ¶ 139);

credit card holders generally had lower credit scores than charge card holders, (Compl. ¶ 139);

customers with "ridiculous balances" were approved, (Compl. ¶ 108); and other customers who

could not pay their charge card balances were allowed to finance their charges through the sign

and travel option, (Compl. ¶ 108).  Further, these CWs reported that AMEX was "issuing credit

to other groups of high risk individuals such as 'new employees, kids in their late teens and early

twenties,' and people with short credit histories," (Compl. ¶ 109); and "lower[ing] its standards"

for issuing credit in 2004 and 2005, (Compl. ¶ 143).  They asserted that as a consequence there

were more Blue Card delinquencies in 2006 and 2007.  (Compl. ¶ 148.)

        CW3 and CW5 were senior executives in AMEX's consumer card division.

(Compl. ¶¶ 113, 128.)  During his tenure, CW3 reported delinquency information to risk

modelers every day.  (Compl. ¶ 113.)  According to CW3, AMEX was aware of the minutia of

each cardholder's demographics and spending habits, and quickly identified any developing

trends.  (Compl. ¶¶ 114-16.)  CW5 characterized the Blue Card as "AMEX's worst performing

product."  (Compl. ¶ 129.)  He also asserted that charge cards were "more risky" because they

had no spending limits, and described FICO scores as a "lagging metric." (Compl. ¶¶ 129-30.)

CW4 was a computer programmer who constructed customer credit risk models under the direction of Risk Management senior executives Gupta and Vernon Marshall ("Marshall"). (Compl. ¶¶ 117, 119.) AMEX amassed customers' "FICO scores, property ownership records, mortgage information, bankruptcies, [and] other debt and employment status." (Compl. ¶ 120.) CW4 "believed" Chenault directed Gupta and Marshall to find ways to expand AMEX's "traditionally high prestige charge card products and increase profits by offering more down market products." (Compl. ¶ 122.) CW4 also stated that AMEX had lowered its criteria for extending revolving credit cards. (Compl. ¶ 124.) He noted an initiative by AMEX to offer cards to students despite indications that recent graduates were very high risk. (Compl. ¶ 123.) In addition, "CW4 labeled the Blue [C]ards as 'subprime' because the Company's modeling showed that the customers who held these cards were higher risk than AMEX's traditional charge card customers." (Compl. ¶ 124.)

CW6 was an account executive at an AMEX subsidiary specializing in pre-paid credit cards. (Compl. ¶ 131.) CW6 claimed that "AMEX maintained a culture of 'internal inflation' pertaining to both financial figures and accomplishments." (Compl. ¶ 132.) CW6 stated that "if he attended a meeting in which he learned that direct mailings had a 5.5% return," AMEX "would proclaim" that the mailings had a return of "around 6%." (Compl. ¶ 132.) CW6 also stated that "AMEX executives often ordered large and unwarranted numbers of pre-paid cards for the Company's various programs that were based on inflated numbers presented to the public rather than on what was, in fact, real." (Compl. ¶ 132.)

CW9 and CW11 were marketing managers at various times from 2003 to 2009.

- 12 -

(Compl. ¶¶ 146, 150.) CW9 stated that AMEX's lending on charge program was "designed to take the pressure off charge card holders who were having difficulty paying off their balances." (Compl. ¶ 146.) CW11 tried to "generate as many applications for cards as possible" and was paid based on the number of submitted applications. (Compl. ¶ 150.)

CW12 was a senior executive in AMEX's Finance Department at its New York headquarters from 2004 to 2008. (Compl. ¶ 152.) His responsibilities included collecting performance data from the Company's business units and "formulating a rolling six-quarter forecast for the Company's business planning." (Compl. ¶ 152.) He also compiled data for presentations about AMEX's performance as compared to its peers. (Compl. ¶ 153.) While CW12 prepared "reports" for AMEX's "'C-Level' management, which included the Company's highest executives, such as Chenault, Henry and Gupta," the Complaint does not describe their contents. (Compl. ¶ 152.)

CW12 interacted with AMEX's Chief Financial Officer ("CFO")—first Crittenden, and, later, Henry. He personally observed AMEX's CFO meeting monthly with the CFOs of AMEX's business units in which they "receive[d] detailed information about the Company's lending book." (Compl. ¶ 158.) Based on "personal observation of the Company's internal reporting system," CW12 professes to know that the "delinquency risk in [AMEX's] owned portfolio was significantly higher than in its managed portfolio," and that this fact "would have been reported to the Company's CFO in the monthly meeting of the CFOs of [AMEX's] business units." (Compl. ¶ 162.)

CW12 bolsters his claims with the following observations about AMEX's lending business:

- 13 -

- "[H]istorically AMEX had shown better figures than that of its peers for delinquencies and write-offs, but more recently in late 2008 and beyond, AMEX's numbers were far worse than its peers." CW12 attributed this to aggressive growth in lending in 2006 and 2007. (Compl. ¶ 154.)

- During 2006 and 2007, "in terms of quality of the accounts AMEX was taking on . . . , [AMEX was] picking up accounts from other credit card providers that historically would not have been AMEX accounts." (Compl. ¶ 154.)

- CW12 noted FICO scores are not always indicative of current credit risks or the quality of new accounts because they do not immediately reflect deterioration in a consumer's finances. (Compl. ¶ 155.)

- AMEX's "share of the wallet" metric measured "what consumers were spending and what percentage of that spending AMEX could capture." CW12 reported that this "was the sort of measurement that the Board of Directors reviewed." (Compl. ¶ 157.)

- The head of AMEX's U.S. Card division—Kelly—reported data compiled by Risk Management to AMEX's CFO. (Compl. ¶ 159.)

- In 2006, CW12 "observed" AMEX implementing "triggers to automatically extend customers' credit lines" without customer approval. (Compl. ¶ 161.)

- AMEX's loan portfolio was "heavily skewed toward small business loans that were prone" to much higher delinquency levels. (Compl. ¶ 162.)

DISCUSSION

I.    Legal Standard

In reviewing a motion to dismiss, a court accepts all facts alleged in the complaint

as true and construes all reasonable inferences in plaintiff's favor. ECA Local 134 IBEW Joint

Pension Trust Fund of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009);

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d

Cir. 2008). A complaint must "contain sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations

and citation omitted). To survive a motion to dismiss, the Court must find that rather than being

mere suspicion, the claim rests on factual allegations sufficient to "raise a right to relief above

the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Determining

whether a complaint states a plausible claim for relief will . . . be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." South

Cherry St. LLC v. Hennesee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009) (citing Iqbal, 129 S. Ct.

at 1950). In making this determination, a court may consider "any written instrument attached to

the complaint, statements or documents incorporated into the complaint by reference, legally

required public disclosure documents filed with the SEC, and documents possessed by or known

to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar

Fund Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).


II.     Section 10(b) & Rule 10b-5 Claim

              To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must allege that the

defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in

connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that

the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105

(citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); see also In re

Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 509 (2d Cir. 2010). A plaintiff alleging securities

fraud must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires that

"the circumstances constituting fraud . . . be stated with particularity." Novak v. Kasaks, 216

F.3d 300, 306 (2d Cir. 2000). In other words, a plaintiff's claim cannot be based on "speculation

and conclusory allegations." Kalnit v. Eicher, 264 F.3d 131, 142 (2d Cir. 2001).

        A well-pled scienter allegation "state[s] with particularity facts giving rise to a

strong inference" that the defendants had a "mental state embracing [the] intent to deceive,

manipulate, or defraud." Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)

(quotations omitted); Teamsters, 531 F.3d at 194. A court must assess "whether all of the facts

alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323; South Cherry,

573 F.3d at 111. However, to qualify as strong, "an inference of scienter must be more than

merely plausible or reasonable—it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; Slayton v. Am. Exp. Co., 604 F.3d

758, 773 (2d Cir. 2010).

        "[A] strong inference of the requisite state of mind may arise where the complaint

sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the

purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to

information suggesting that their public statements were not accurate; or (4) failed to check

information they had a duty to monitor." South Cherry, 573 F.3d at 110 (citing Novak, 216 F.3d

at 311). "The Second Circuit has long held that the scienter element can be satisfied by a strong

showing of reckless disregard for the truth." South Cherry, 573 F.3d at 109 (citations omitted).

Reckless disregard means "conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." South Cherry, 573 F.3d at 109 (emphasis omitted).

Here, Plaintiff alleges that Defendants either knew of, or recklessly disregarded, information showing that AMEX had lowered its lending guidelines, was exposed to increasing delinquencies, and had established improper loss reserves. Plaintiff avers that Defendants were motivated to hide this information because AMEX needed to maintain funding from the capital markets.

### a. Concrete & Personal Benefit

Reviewing the entirety of the Complaint, there is no allegation that the Individual Defendants "benefited in a concrete and personal way from the purported fraud." Novak, 216 F.3d at 311. The only motive identified by Plaintiff is Defendants' desire to maintain AMEX's strong credit rating so that the Company did not lose capital markets funding. However, "[m]otives that are generally possessed by most corporate directors and officers" are insufficient to establish fraudulent intent. Kalnit, 264 F.3d at 139; Tabor v. Bodisen Biotech, Inc., 579 F. Supp. 2d 438, 449 (S.D.N.Y. 2008) ("General motives that can be applied to virtually all corporate insiders . . . are not sufficient to support a claim of fraud." (quotations omitted)). The desire to maintain a strong credit rating, possessed by nearly every corporate executive, is not within the class of "benefits" that give rise to a strong inference of scienter. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 814 (2d Cir. 1996) ("[A] company's desire to maintain a high bond or credit rating [does not] qualif[y] as a sufficient motive for fraud . . . . [I]f scienter could be pleaded on that basis alone, virtually every

- 17 -

company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); In re PXRE Grp., LTD, Sec. Litig., 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price . . . is far too generalized . . . to allege the proper 'concrete and personal' benefit required by the Second Circuit.").

     b.  Reckless Disregard for the Truth

     Plaintiff has also failed to allege specific facts establishing that Defendants knew their public statements were inaccurate or failed to check information they had a duty to monitor. South Cherry, 573 F.3d at 110. To establish reckless disregard, Plaintiff must "specifically identify the reports or statements" that contradict the Individual Defendants' alleged misrepresentations. Teamsters, 531 F.3d at 196 (citing Novak, 216 F.3d at 309); In re Hardinge, Inc. Sec. Litig., --- F. Supp. 2d ----, 2010 WL 447397, at *18 (W.D.N.Y. Feb. 2, 2010) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information to indicate how it was inconsistent with the statements made."). A complaint's "general allegations that, by virtue of their senior positions . . ., the Individual Defendants necessarily had access to nonpublic information, are insufficient to show recklessness." In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009). Moreover, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." Novak, 216 F.3d at 309; In re Gildan, 636 F. Supp. 2d at 273.

     Plaintiff's allegations of reckless disregard are a gossamer patchwork of general

- 18 -

statements from the CWs and inferences from reports published after the allegedly false and misleading statements were made. With the exception of CW12, none of the CWs identify a report demonstrating that the Individual Defendants were aware of a less restrictive lending policy or specific adverse credit data contradicting their public statements. See Teamsters, 531 F.3d at 196 (noting plaintiff's failure to "specifically identif[y] any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements"); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations.").[2]

Instead, the CWs offer "observ[ations]" that AMEX issued credit to high risk individuals, "belie[fs]" that some customers had trouble paying their bills, or conclusory statements that AMEX had "lowered its lending criteria." These anecdotes and conclusory statements of belief cannot form the basis for a finding of reckless disregard. See Kalnit, 264 F.3d at 142 (a plaintiff's claim cannot be based on "speculation and conclusory allegations"); In re IAC/InterActiveCorp Sec. Litig., 695 F. Supp. 2d 109, 115 (S.D.N.Y. 2010) (courts do "not credit mere conclusory statements or threadbare recitals of the elements of a cause of action"); see also Novak, 216 F.3d at 306 ("[I]t is well-established that a securities fraud complaint must also plead certain facts with particularity in order to state a claim." (emphasis added)).

In addition, many of the CWs were employed in rank-and-file positions or by

---

[2] Plaintiff's reliance on In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241 (S.D.N.Y. 2010) and Inst. Investors Grp. v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009) is misplaced. The plaintiffs in those cases identified reports with far more specificity than Plaintiff has here.

outside contractors. With one exception, these low-level employees had no contact with the

Individual Defendants. See Campo v. Sears Holdings Corp., 635 F. Supp. 2d 323, 335 (S.D.N.Y.

2009) (discounting statements of confidential witnesses who had no contact with the individual

defendants); Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 141 (D. Conn. 2007) ("[N]one of

the CWs present any evidence that they communicated any of the alleged problems . . . to any of

the Individual Defendants . . . ."). Furthermore, most of these employees had no access to

aggregated data regarding credit risk, and none averred that they received a directive from the

Company to lower credit standards. See In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 220

(S.D.N.Y. 2008) ("Plaintiffs do not allege any facts indicating that [the confidential witness] was

in a position to have knowledge regarding communications with [the Company's] senior

management or the conclusions reached by . . . management upon receipt of this information.").

Four confidential witnesses—CW3, CW4, CW5, and CW12—were privy to

certain adverse credit or lending data. Nevertheless, a close examination of their statements

reveals the absence of any allegation that such data had been presented to management around

the time of Defendants' allegedly misleading statements. For example, CW3 and CW5—senior

executives in AMEX's consumer card division—simply state that they had access to real-time

data, which was passed to Risk Management and used to drive underwriting decisions. Their

allegations that "FICO scores . . . [were] a lagging metric," (Compl. ¶ 130), and that Chenault's

statements touting FICO scores were "half-truths," (Compl. ¶ 115), fail to demonstrate, in even

the most general terms, that adverse credit data was transmitted to the Individual Defendants.

While CW4 described AMEX's complex risk management system and stated that AMEX had

lowered its criteria for new cardholders, he offered only one example—AMEX's initiative to

offer cards to students despite indications that recent graduates were high risk customers. And he did not connect either of the Individual Defendants to that initiative.

Only CW12 had contact with the Individual Defendants. He prepared reports for senior executives, and noted that "what consumers were spending and what percentage of that spending AMEX could capture" was the "sort of measurement that the Board of Directors reviewed." He also asserted that the head of AMEX's U.S. Card division reported data compiled by Risk Management to AMEX's Chief Financial Officer, and that higher delinquency rates due to small business loans "would have been reported to the Company's CFO" in monthly meetings. This is the most specific information on scienter pled in the Complaint; still, even these averments fail to raise a strong inference that the Individual Defendants had specific information contradicting their public statements.

Notably, these allegations do not establish what specific contradictory information the Individual Defendants received or when they received it. See In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (finding a CW's statement that he attended meetings during which reports were circulated and questions were raised to be "so vague as to be meaningless, because[, inter alia,] it contains no time frame within which the meetings occurred, . . . and no information regarding how extensively or in what manner the reports were discussed."). Plaintiff identifies no specific report on 30-day delinquency rates or housing market information showing that the Individual Defendants were aware their public statements were contradicted by adverse credit data. See Teamsters, 531 F.3d at 196; Cornwell v. Credit Suisse Grp., 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (crediting reports identified by confidential witnesses where the contents, dates and recipients of those reports were described in

detail); Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC, 474 F. Supp. 2d 505,

517 (S.D.N.Y. 2007) (to survive a motion to dismiss, the plaintiff must "specify the internal

reports, who prepared them and when, how firm the numbers were or which company officers

reviewed them" (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001))); In

re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897 (HB), 2009 WL 3380621, at *4, *14

(S.D.N.Y. Oct. 9, 2009) (finding scienter where defendants recklessly disregarded "Audit

Reports," "Monthly Collateral Reports," and "Basis Reports" that contained information such as

"the number and dollar amount of mobile home loans by region, [and] loans' credit quality on

[an] 'A' to 'C' scale," and showed that borrowers' "creditworthiness was not consistent with

underwriting guidelines").

    Moreover, CW12's assertions that certain information was the "sort of

measurement" or "would have been" reviewed by the Individual Defendants are too speculative

to give rise to a strong inference of scienter. See Kalnit, 264 F.3d at 142 (stating that a plaintiff's

claim cannot be based on "speculation and conclusory allegations"). CW12's claim that Henry

received "detailed" information fails for the same reason. A plaintiff cannot satisfy a legal

requirement merely by intoning vague descriptions bereft of any particulars. Cf. Kalin v.

Xanboo, Inc., No. 04 Civ. 5931 (RJS), 2009 WL 928279, at *14 (S.D.N.Y. Mar. 30, 2009) ("[A]

bald assertion that [a shareholder] demand was made 'with particularity' does not suffice to

make it so."). Indeed, if "detailed" reports were circulated regularly among AMEX's senior

management, CW12 should be able to identify the names and contents of these documents, or

recount specific meetings at which the Individual Defendants actually received contradictory

information. Here again, bland assertions that they "would have received" such information offer nothing concrete and are not allegations of fact.

Plaintiff's reliance on Risk Management's reporting system is also insufficient to establish scienter. Although Risk Management compiled credit and performance data and reported its conclusions through the corporate hierarchy, the "existence of channels [of information] is not enough." Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 522 (S.D.N.Y. 2005). Nor is it sufficient to allege that Risk Management "came to conclusions." The complaint must provide specificity about these conclusions, including when they were made and how they were presented to the Individual Defendants. See Teamsters, 531 F.3d at 196 ("[Plaintiffs'] broad reference to raw data lacks even an allegation that these data had been collected into reports . . . . Accordingly, they have not raised an inference of scienter based on knowledge of or access to information demonstrating the inaccuracy of [defendant's] public statements."). The Complaint offers not even a glimpse of the "conclusions" made by Risk Management. See Fadem, 352 F. Supp. 2d at 522 ("There is no evidence of what information was actually passed through these channels."). To the extent the Complaint's allegations rest on the assumption that the Individual Defendants received information because of their corporate positions, they are deficient. See In re Sotheby's Holding, Inc., No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.").

Plaintiff also points to an AMEX chart from 2008 to substantiate its allegation that the Company lowered underwriting guidelines. That chart reveals higher write-offs for

cards issued in 2006 and 2007. According to Plaintiff, the rise in write-offs occurred "as early as 13 months after the cards were issued." (Pls.' Opp'n Br. at 9.) But that, in turn, suggests that any spike in write-offs for 2007 accounts would not have been evident until 2008. If the Individual Defendants were unaware of a spike in write-offs for recently issued cards until sometime in 2008, then common sense cautions against the inference that the Individual Defendants acted with knowledge or reckless disregard. See Iqbal, 129 S. Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on . . . common sense."). This conclusion is buttressed by Plaintiff's assertion that the "principal statements alleged to be false and misleading . . . are the oral representations made in the second half of 2007 by Chenault and Henry . . . ." As for the spike in write-offs for 2006 cards, Plaintiff makes no showing that the Individuals Defendants were aware of a specific report containing this information. Moreover, Plaintiff's highest ranking confidential witness— CW12—undermines these allegations by asserting that until 2008 AMEX had "shown better figures than that of its peers for delinquencies and write-offs." Accordingly, this Court declines to find that these statistics contribute to a strong inference of scienter.

Plaintiff's reliance on a December 11, 2008 Deutsche Bank report is also unavailing. The Complaint alludes to the report's finding that AMEX ramped up its subprime lending, which "dramatically increased default rates in accounts acquired by AMEX in 2005, 2006, and 2007." But the Complaint fails to allege that the Individual Defendants were aware of the report's contents at the time they made their alleged false statements.

With respect to Plaintiff's allegation that Henry misled analysts about AMEX's loss reserves, the Complaint alleges no facts suggesting that he held the "mental state embracing

- 24 -

the intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 319; see Fort Worth Emp'rs Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 226 (S.D.N.Y. 2009) ("The mere allegation that Defendants failed to disclose a risk does not in and of itself constitute strong evidence that they did so with scienter."). AMEX disclosed the method by which it calculated loss reserves in its public filings. Plaintiff fails to allege that Henry was aware of specific adverse credit data showing that loss reserves were too low. To the extent Plaintiff relies on the fact that the loss reserves proved inadequate, such allegations must be rejected as "a classic example of fraud by hindsight." Fort Worth, 615 F. Supp. 2d at 226 (quotations omitted); In re Gildan, 636 F. Supp. 2d at 273 ("[T]he Second Circuit has 'refused to allow plaintiffs to proceed with allegations of fraud by hindsight.'" (quoting Novak, 216 F.3d at 309)).

      c.  Competing Inferences

          Under Tellabs, Plaintiff's inferences of scienter must be "cogent" and more compelling than other explanations for Defendants' conduct. 551 U.S. at 314.

          The Complaint's allegations, taken collectively, reveal a company attempting to increase its share of the credit card market during significant financial turmoil. That AMEX's losses were higher than those of its competitors does not alone support the inference that Defendants acted with intent or reckless disregard. See In re PXRE, 600 F. Supp. 2d at 545 ("[I]t is well established that the size of the fraud alone does not create an inference of scienter." (quotations omitted)). The more compelling inference is that Defendants' aggressive growth strategy was sideswiped by the collapse of the credit markets. See Tellabs, 551 U.S. at 314 (plaintiff's inference must be "more than merely plausible or reasonable"). While Plaintiff

musters twelve confidential witnesses, not one of them can identify a single specific report containing adverse credit data or relaxed underwriting guidelines.

Although it is conceivable that AMEX sought to conceal mounting losses, in the midst of a credit meltdown, this is not a cogent and compelling explanation. AMEX pursued its expansionary strategy at the wrong time. That a business plan turned out to be ill-timed and, in hindsight, ill-advised does not transmogrify it into a securities fraud.

Because Plaintiff has failed to plead facts establishing scienter, this Court does not address the parties' remaining arguments.

III.    Section 20(a) Claim

To allege a prima facie case of liability under § 20(a), a plaintiff must first plead a primary violation by a control person. In re PXRE, 600 F. Supp. 2d at 548 (citing Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)). This Court has determined that Plaintiff has not adequately pled a primary violation under § 10(b) and Rule 10b-5. Accordingly, Defendants' motion to dismiss the § 20(a) claim is granted.

IV.    Leave to Amend

In the final footnote of its opposition, Plaintiff requests leave to amend the Complaint if it is deficient in any respect. Under Fed. R. Civ. P. 15(a), a "court should freely give leave when justice so requires." "However, in determining whether leave to amend should be granted, the district court [may] consider . . . the apparent 'futility of amendment.'" Grace v. Rosenstock, 228 F.3d 40, 53 (2d Cir. 2000) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

Any request for leave to file an amended consolidated class action complaint should conform to

this Court's Individual Practices and be made by August 23, 2010.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted and the

Consolidated Class Action Complaint is dismissed.  The Clerk of the Court is directed to

terminate all pending motions and mark this case as closed.

Dated: July 19, 2010
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Beth A. Kaswan, Esq.
Thomas L. Laughlin IV, Esq.
Scott & Scott, L.L.P.
500 Fifth Avenue, 40th Floor
New York, NY 10110
*Counsel for Lead Plaintiff Local No. 38, IBEW Pension Fund*

Curtis V. Trinko, Esq.
Law Offices of Curtis V. Trinko, LLP
16 West 46th Street, 7th Floor
New York, NY 10036

Alfred G. Yates, Jr., Esq.
Gerald L. Rutledge, Esq.
Law Offices of Alfred G. Yates, Jr.
429 Forbes Avenue
Pittsburgh, PA 15219
*Counsel for John Baydale*

Robert E. Zimet, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
*Counsel for Defendants*